UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          :
                                  :       Case No.  12-CR-00014 (RMC)
          v.                      :
                                  :
                                  :
OSCAR R. ORTEGA-HERNANDEZ         :       Motions Hearing:  September 6, 2013
          Defendant.              :

## GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE AND PRECLUDE ARGUMENTS ESTABLISHING A FACTUAL IMPOSSIBILITY DEFENSE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby moves this Court to exclude evidence and preclude arguments offered by the defendant Oscar Ramiro Ortega-Hernandez that attempt to establish a factual impossibility defense, namely, that he is not guilty of count one of the Indictment charging him with attempted assassination of the President of the United States because there was no way the President of the United States could have been harmed by the defendant's actions. As grounds for this motion, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing, if any, on the motion.

## FACTUAL BACKGROUND

On the night of November 11, 2011, Oscar Ramiro Ortega-Hernandez ("Ortega-Hernandez") attempted to assassinate the President of the United States by firing round after round from his semi-automatic assault rifle at the White House. That attack was the culmination of several months during which the defendant fulminated against the President, whom he perceived to be the Anti-Christ, made threats against him, and prepared to take violent action against him. To accomplish his goal, Ortega-Hernandez traveled more than 2,000 miles by car from Idaho Falls, Idaho, to Washington, D.C., with his assault rifle and more than one hundred and eighty rounds of ammunition.

## A. Preparation for the Attack

On March 19, 2011, eight months prior to the attack, Ortega-Hernandez purchased a Romanian Cugir SA semi-automatic (AK-47 style) assault rifle from W-12 in Idaho.  W-12 sold the weapon to Ortega-Hernandez for $550.  Ortega-Hernandez then purchased, according to W-13, more than 1,200 rounds of ammunition to use with the weapon.  Over the course of the next six months, Ortega-Hernandez practiced firing the assault rifle at a desolate crater located on land owned by the Bureau of Land Management outside of Idaho Falls, Idaho.

In approximately August 2011, Ortega-Hernandez purchased a scope kit on the Internet and asked W-13 to install it on the weapon for him.  That scope kit included a mount, a scope, a laser sight, and a flashlight.  After the scope was installed, Ortega-Hernandez again took the weapon out for shooting practice with W-13.  According to W-13, Ortega-Hernandez practiced shooting at items like a home stereo amplifier, an empty ammunition case, a video cassette recorder, and a stereo speaker.

Since mid-2010, Ortega-Hernandez has also made it no secret among many of his associates in Idaho that he holds deep contempt for President Obama.  For example, he told W-14 that "Obama is the Antichrist" and that "something needs to be done about it or else we're fucked," or words to that effect.  Ortega-Hernandez also told W-7 that President Obama was the "Antichrist" and that "President Obama needed to be taken care of."  Ortega-Hernandez described himself to W-4 as "Jesus Christ"[1] and that President Obama was the Antichrist, with

---

[1]  In a forty-minute video recorded on September 16, 2011, with the assistance of W-15, a college student working in video production, Ortega-Hernandez described himself as a "modern-day Jesus Christ that you all have been waiting for."

the admonition "somebody's got to do something about that," or words to that effect.[2]   W-10 also recalls that on one occasion in September 2011 Ortega-Hernandez referred to President Obama as a "little bitch" and the "devil"; Ortega-Hernandez further described himself as the person who had been "chosen" to "take care of" President Obama, which W-10 took to mean kill the President.

### B.  Ortega-Hernandez's Travel to Washington, D.C.

In mid-October 2011, Ortega-Hernandez packed his 1998 black Honda Accord with some personal possessions and left Idaho Falls, driving east.  Ortega-Hernandez brought his Romanian Cugir SA semi-automatic assault rifle with him, as well as over one hundred and eighty rounds of ammunition.

On approximately October 25, 2011, Ortega-Hernandez arrived at a hotel where W-16 and W-17 were temporarily residing in Indiana, Pennsylvania.  Ortega-Hernandez remained in the company of W-16 and W-17 for at least two weeks as a guest, even traveling to New York City with them for an overnight trip with their family.  During the course of his stay with W-16 and W-17, Ortega-Hernandez never showed either of them the semi-automatic assault rifle that he had brought with him from Idaho.  According to W-17, Ortega-Hernandez left Indiana, Pennsylvania, at some time between November 7 and November 9, 2011.  He traveled from there to the Washington, D.C. area.

---

[2]   This formulation of the defendant's threatening language was provided to investigators by W-4 on or about November 20, 2011, and November 22, 2011.  The affidavit in support of the arrest warrant in this matter reports that W-4 said that Ortega-Hernandez wanted to "hurt" President Obama, which is what W-4 stated during a telephone interview with law enforcement on November 13, 2011.  In an interview on November 14, 2011, W-4 stated that Ortega-Hernandez "wanted to kill Obama and that the President was the devil and anti-Christ."  Another witness, W-6, told law enforcement that on November 13, 2011, W-4 told W-6 that Ortega-Hernandez said "Obama was the Antichrist and that [Ortega-Hernandez] wanted to kill him," or words to that effect.  W-4 has since claimed not to remember having heard Ortega-Hernandez threaten to kill the President; however, the witness does not deny having made the earlier statements to law enforcement.

The defendant arrived in the Washington area by no later than November 11, 2011. At about 10:00 AM on the morning of November 11, 2011, police officers in Arlington County, Virginia, stopped Ortega-Hernandez in response to a report that he was a suspicious person looking into houses. The police photographed him wearing a black hooded LA Dodgers jacket.[3] At approximately 4:45 PM in the afternoon of November 11, 2011, Ortega-Hernandez went to a Walmart store in Fairfax, Virginia, and purchased a number of items. Ortega-Hernandez appears on surveillance video recovered from that store, and has been identified by W-20 who saw him in the store that day.

### C.  Ortega-Hernandez's Attack on the White House

Later that night, shortly before 9:00 PM, Ortega-Hernandez was driving his car westbound on Constitution Avenue when he stopped directly across the Ellipse from the South Lawn of the White House. With the passenger-side window of his car lowered, he pointed his semi-automatic assault rifle out the window of the car and aimed directly at the White House. The defendant opened fire on a residential section of the White House, and then fled the scene in his car, driving erratically and at a high rate of speed.

Moments later, the defendant crashed his vehicle near the ramp from Constitution Avenue to the Theodore Roosevelt Bridge in front of the U.S. Institute of Peace. After efforts to restart the vehicle failed, Ortega-Hernandez quickly ran from the car on foot, leaving behind many personal possessions. Law enforcement officers who later searched the car recovered the following items, among others:

---

[3] At the time of the stop, Ortega-Hernandez refused to allow the officers to search his 1998 black Honda Accord.

- A Romanian Cugir SA semi-automatic assault rifle with a large scope mounted on the top portion of the weapon and a magazine attached to it;[4]

- Three magazines fully-loaded with an additional ninety-three 7.62 x 39 mm cartridges; the Federal Bureau of Investigation ("FBI") conducted a fingerprint analysis of these magazines and found ten latent prints of value on two of the magazines. All ten of these latent fingerprints have been identified as fingerprints of Ortega-Hernandez;

- Twelve spent shell casings for 7.62 x 39 mm cartridges; the FBI has conducted an assessment of these spent shell casings and has concluded that all twelve were fired from Ortega-Hernandez's rifle;

- Five boxes of 7.62 x 39 mm cartridges;

- A black hooded Los Angeles Dodgers jacket identical to the one Ortega-Hernandez had been photographed wearing earlier that day in Arlington County, Virginia; and

- The receipt from the Fairfax, Virginia, Walmart store, where Ortega-Hernandez had been at approximately 4:45 p.m. that day.

The car itself was registered to Ortega-Hernandez and one other person.[5]   Soon after law enforcement identified the defendant as one of the owners of the vehicle, he became the subject of a multi-agency manhunt that crossed several jurisdictions.

Following the shooting on November 11, 2011, the FBI searched the area around the White House and located more than five confirmed bullet impact points on the south side of the building on or above the second story. That area of the White House is widely known to be the residence of the First Family. Two bullets were also recovered from the White House: one from a window frame on the Truman Balcony and one found on the ground east of the entrance. The

---

[4] The weapon was registered to W-12 and was purchased at a gun store in Idaho Falls, Idaho. W-12 has identified this weapon as the same weapon W-12 sold to Ortega-Hernandez on March 19, 2011, except for the addition of the after-market scope. W-13 has stated that this rifle is the one on which W-13 installed a scope kit at the request of Ortega-Hernandez.

[5] The FBI has conducted an analysis of the interior of the car for latent fingerprints. The FBI identified three latent prints of value inside the car: one on the driver's side door handle, one on the driver's seat belt side, and one on a dietary supplement bottle. All three of those latent fingerprints have been identified as fingerprints of Ortega-Hernandez. No other latent fingerprints were recovered from the vehicle.

FBI concluded that both of those bullets were fired by Ortega-Hernandez's weapon. The FBI also recovered a bullet jacket that was found in the window sill of the Truman Balcony, which it has also concluded was fired from Ortega-Hernandez's weapon.[6]

### D. Ortega-Hernandez's Flight

Following the shooting, on November 14, 2011, W-18 was in the area of Shenandoah Junction, West Virginia, photographing trains. W-18 is a former FBI photographer who takes photographs of cargo trains as a hobby. W-18 noticed an individual riding inside one of the empty hopper cars. W-18 thought this was rare and took a picture. Later, W-18 noticed that the stowaway he had photographed looked like Ortega-Hernandez and contacted law enforcement. Subsequently, associates of Ortega-Hernandez have viewed that photograph and have confirmed that this photograph is one of Ortega-Hernandez. The cargo train that Ortega-Hernandez had boarded was headed northwest from Washington, D.C.

### E. Ortega-Hernandez's Arrest

On November 16, 2011, Ortega-Hernandez was arrested on a warrant by Pennsylvania State Police ("PSP") troopers, at the same hotel where he had stayed with W-16 and W-17 the previous week in Indiana, Pennsylvania.

### F. The President's Whereabouts on November 11, 2011

According to the schedule publicly released by the White House, on November 11, 2011, at approximately 9:30 AM, the President of the United States along with the First Lady hosted a breakfast with veterans at the White House to commemorate the Veteran's Day holiday. Later that morning, the President and the First Lady left the White House and traveled to Arlington National Cemetery to participate in a wreath-laying ceremony. Following the ceremony, the

---

[6] Several fragments were also collected in that area but could not be identified or eliminated as having been fired from that rifle.

President and the First Lady returned to the White House.  At approximately 1:05 PM, the President and the First Lady departed the White House to travel to Joint Base Andrews in Prince George's County, Maryland.  From there, the President and the First Lady traveled to San Diego, California to participate in additional Veteran's Day celebrations.

Accordingly, at the time of Ortega-Hernandez's attack on the White House, shortly before 9:00 PM on November 11, 2011, the President and the First Lady were not present at the White House, having left approximately eight hours earlier to travel to California.  Moreover, even had the President been at the White House, Ortega-Hernandez's attack had little chance of success due to security measures taken by the United States Secret Service.  Other members of the First Family were present in the White House at the time of the defendant's attack, but were unharmed.

## ARGUMENT

Ortega-Hernandez is charged by way of indictment with inter alia Attempting to Assassinate the President of the United States, in violation of Title 18, United States Code Section 1751(c).  The statutory language of Section 1751(c) states that "[w]hoever attempts to kill [the President of the United States] shall be punished by imprisonment for any term of years or for life."  The D.C. Circuit Court of Appeals has explained that attempted assassination, like any other criminal attempt charge, requires the government to prove (i) the defendant had the requisite specific intent for the crime; and (ii) had taken a "substantial step" towards the completion of that crime.  United States v. Duran, 96 F.3d 1495, 1507-08 (D.C. Cir. 1996); see also United States v. Dworken, 855 F.2d 12, 16-17 (1st Cir. 1988).  Therefore, in the context of attempted assassination, the United States must prove that the defendant (i) intended to

assassinate the President of the United States; and (ii) took a "substantial step" towards accomplishing that objective.

In the Duran case, which is factually similar to the instant case, the defendant "had on numerous occasions expressed...a strong desire to kill the President, and...had purchased a rifle, ammunition clips, and an overcoat large enough to conceal the rifle...then traveled to Washington, D.C. and stood by the White House gate with the rifle and ammunition concealed." Duran, 96 F.3d at 1508. The Court explained that the defendant's purchase of a weapon, ammunition, and the overcoat, his travel from Colorado Springs to Washington, D.C., and his presence at the White House gate, all constituted "substantial steps" in pursuit of his objective. Id. In upholding the attempted assassination conviction, the D.C. Circuit held that "the jury had ample evidence from which to conclude that [the defendant] completed the crime of attempted assassination of the President before he began firing [at an individual on the White House grounds]." Id. (emphasis added). Whether the President was ever in harm's way was irrelevant under the law to the defendant's conviction. Id.

The D.C. Circuit's holding in Duran is consistent with the long-held principle that "impossibility of completing the crime because the facts were not as the defendant believed is not a defense. 'All courts are in agreement that what is usually referred to as factual impossibility is no defense to a charge of attempt.'" United States v. Williams, 553 U.S. 285, 300 (2008) (quoting 2 W. LaFave, Substantive Criminal Law § 11.5(a)(2) (2d Ed. 2003)). See e.g., United States v. Washington, 106 F.3d 983, 1005-06 (D.C. Cir. 1997) (affirming narcotics convictions where defendants aided and abetted undercover federal agents who they thought were drug dealers); United States v. Harrick, 43 F.3d 877, 885 (4th Cir. 1995) (upholding conviction of attempted murder even though bomb used by defendant was fake); United States v.

Page 8

Contreras, 950 F.2d 232, 237 (5th Cir. 1991) (upholding conviction for attempted murder of a witness despite fact the defendant was unaware where the witness lived); United States v. Medina-Garcia, 918 F.2d 4, 8 (1st Cir. 1990) (affirming convictions for attempted transport of aliens and conspiring to transport aliens even though aliens were in fact undercover federal agents). As the Fourth Circuit has explained, "[t]here is no reason to exonerate a person who has demonstrated a willingness to commit a criminal act, but was unable to complete the dastardly deed because of an unknown outside circumstance." United States v. Harrick, 995 F.2d 1267, 1273 (4th Cir. 1993). Accordingly, the relevant inquiry is whether the attempted crime would have been completed had the circumstances been the way the defendant believed them to be, rather than how they may have existed in fact. Williams, 553 U.S. at 300. As the district court in Duran explained, "the fact that the person whom the Defendant shot at was not, in fact, President Clinton was an extraneous circumstance, unknown to him, which prevented consummation of the intended crime." United States v. Duran, 884 F. Supp. 577, 580 n.5 (D.D.C. 1995).

Applying these principles to the instant case, this Court, like the Duran court, should exclude evidence and preclude arguments offered by Ortega-Hernandez that attempt to establish a factual impossibility defense. The evidence at trial will clearly demonstrate that, like the defendant in Duran, Ortega-Hernandez expressed a strong desire to kill the President on numerous occasions. Ortega-Hernandez referred to the President as "the devil," "the Antichrist," and a "little bitch." Furthermore, he stated that "something needs to be done about it or else we're fucked," "President Obama needed to be taken care of," "somebody's got to do something about that," and that he was the one "chosen" to "take care of" the President.

Moreover, the evidence at trial will clearly demonstrate that, like the defendant in Duran, Ortega-Hernandez took numerous "substantial steps" to achieve his objective of killing the President. Specifically, he purchased the Romanian Cugir SA semi-automatic assault rifle, a scope to attach to the rifle, and 1,200 rounds of ammunition to use with the rifle. He repeatedly practiced with the rifle over a six-month period at a desolate crater outside of Idaho Falls, Idaho. In October 2011, Ortega-Hernandez traveled more than 2,000 miles by car from Idaho Falls, Idaho, to Washington, D.C., with his assault rifle and more than one hundred and eighty rounds of ammunition. On November 11, 2011, Ortega-Hernandez drove his car westbound on Constitution Avenue, stopped directly across the Ellipse from the South Lawn of the White House, pointed his semi-automatic assault rifle out the window of the car, and opened fire on the White House residence.

The fact that the President had left the White House eight hours prior to Ortega-Hernandez's attack "was an extraneous circumstance, unknown to him, which prevented consummation of the intended crime." Duran, 884 F. Supp. at 580 n.5. Similarly, the fact that Ortega-Hernandez's attack had little chance of success even had the President been at the White House does not alter the defendant's intent on the night of the attack, nor the substantial steps he took to bring about his objective. Accordingly, any evidence or arguments by the defense pertaining to the President's whereabouts on the night of November 11, 2011, the security measures at the White House, or otherwise that the President could not have been harmed by the defendant's actions, are improper, and therefore should be excluded. See United States v. Duran, 884 F. Supp. 566, 569 (D.D.C. 1995) (holding that "the Defendant will not be able to assert the defense of factual impossibility, and therefore, may not refer to it in opening statements or throughout the trial").

## CONCLUSION

Because factual impossibility is not a defense to a charge of attempted assassination of the President of the United States, the United States respectfully requests that this Court exclude all evidence and preclude any arguments relating to the President's whereabouts on the night of November 11, 2011, the security measures at the White House, or otherwise that the President could not have been harmed by the defendant's actions.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar No. 447-889

By: _____
GEORGE P. VARGHESE
Special Assistant United States Attorney
ALESSIO D. EVANGELISTA
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, DC 20530
(617) 748-3237 (Varghese)
(202) 252-7247 (Evangelista)