UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 12-CR-00014 (RMC) |
| v. | : | |
| | : | |
| OSCAR R. ORTEGA-HERNANDEZ | : | Motions Hearing: September 6, 2013 |
| Defendant. | : | |

### GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE AND PRECLUDE ARGUMENTS ESTABLISHING DIMINISHED MENTAL CAPACITY

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby moves this Court to exclude evidence and preclude any arguments offered by the defendant Oscar Ramiro Ortega-Hernandez that attempt to establish that he suffers from a diminished mental capacity or any other cognitive limitations which rendered him unable to form the specific intent necessary to commit crimes for which he is charged in the Indictment. As grounds for this motion, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing, if any, on the motion.

### FACTUAL BACKGROUND

On the night of November 11, 2011, Oscar Ramiro Ortega-Hernandez ("Ortega-Hernandez" or "the defendant") attempted to assassinate the President of the United States by firing round after round from his semi-automatic assault rifle at the White House. That attack was the culmination of several months during which the defendant fulminated against the President, whom he perceived to be the Anti-Christ, made threats against him, and prepared to take violent action against him. To accomplish his goal, Ortega-Hernandez traveled more than

2,000 miles by car from Idaho Falls, Idaho, to Washington, D.C., with his assault rifle and more than one hundred and eighty rounds of ammunition.

### A. Preparation for the Attack

On March 19, 2011, eight months prior to the attack, Ortega-Hernandez purchased a Romanian Cugir SA semi-automatic (AK-47 style) assault rifle from W-12 in Idaho. W-12 sold the weapon to Ortega-Hernandez for $550. Ortega-Hernandez then purchased, according to W-13, more than 1,200 rounds of ammunition to use with the weapon. Over the course of the next six months, Ortega-Hernandez practiced firing the assault rifle at a desolate crater located on land owned by the Bureau of Land Management outside of Idaho Falls, Idaho.

In approximately August 2011, Ortega-Hernandez purchased a scope kit on the Internet and asked W-13 to install it on the weapon for him. That scope kit included a mount, a scope, a laser sight, and a flashlight. After the scope was installed, Ortega-Hernandez again took the weapon out for shooting practice with W-13. According to W-13, Ortega-Hernandez practiced shooting at items like a home stereo amplifier, an empty ammunition case, a video cassette recorder, and a stereo speaker.

Since mid-2010, Ortega-Hernandez has also made it no secret among many of his associates in Idaho that he holds deep contempt for President Obama. For example, he told W-14 that "Obama is the Antichrist" and that "something needs to be done about it or else we're fucked," or words to that effect. Ortega-Hernandez also told W-7 that President Obama was the "Antichrist" and that "President Obama needed to be taken care of." Ortega-Hernandez described himself to W-4 as "Jesus Christ"[1] and that President Obama was the Antichrist, with

---

[1] In a forty-minute video recorded on September 16, 2011, with the assistance of W-15, a college student working in video production, Ortega-Hernandez described himself as a "modern-day Jesus Christ that you all have been waiting for."

the admonition "somebody's got to do something about that," or words to that effect.[2]  W-10 also recalls that on one occasion in September 2011 Ortega-Hernandez referred to President Obama as a "little bitch" and the "devil"; Ortega-Hernandez further described himself as the person who had been "chosen" to "take care of" President Obama, which W-10 took to mean kill the President.

### B.  Ortega-Hernandez's Travel to Washington, D.C.

In mid-October 2011, Ortega-Hernandez packed his 1998 black Honda Accord with some personal possessions and left Idaho Falls, driving east.  Ortega-Hernandez brought his Romanian Cugir SA semi-automatic assault rifle with him, as well as over one hundred and eighty rounds of ammunition.

On approximately October 25, 2011, Ortega-Hernandez arrived at a hotel where W-16 and W-17 were temporarily residing in Indiana, Pennsylvania.  Ortega-Hernandez remained in the company of W-16 and W-17 for at least two weeks as a guest, even traveling to New York City with them for an overnight trip with their family.  During the course of his stay with W-16 and W-17, Ortega-Hernandez never showed either of them the semi-automatic assault rifle that he had brought with him from Idaho.  According to W-17, Ortega-Hernandez left Indiana, Pennsylvania, at some time between November 7 and November 9, 2011.  He traveled from there to the Washington, D.C. area.

---

[2]  This formulation of the defendant's threatening language was provided to investigators by W-4 on or about November 20, 2011, and November 22, 2011.  The affidavit in support of the arrest warrant in this matter reports that W-4 said that Ortega-Hernandez wanted to "hurt" President Obama, which is what W-4 stated during a telephone interview with law enforcement on November 13, 2011.  In an interview on November 14, 2011, W-4 stated that Ortega-Hernandez "wanted to kill Obama and that the President was the devil and anti-Christ."  Another witness, W-6, told law enforcement that on November 13, 2011, W-4 told W-6 that Ortega-Hernandez said "Obama was the Antichrist and that [Ortega-Hernandez] wanted to kill him," or words to that effect.  W-4 has since claimed not to remember having heard Ortega-Hernandez threaten to kill the President; however, the witness does not deny having made the earlier statements to law enforcement.

The defendant arrived in the Washington area by no later than November 11, 2011. At about 10:00 AM on the morning of November 11, 2011, police officers in Arlington County, Virginia, stopped Ortega-Hernandez in response to a report that he was a suspicious person looking into houses. The police photographed him wearing a black hooded LA Dodgers jacket.[3] At approximately 4:45 PM in the afternoon of November 11, 2011, Ortega-Hernandez went to a Walmart store in Fairfax, Virginia, and purchased a number of items. Ortega-Hernandez appears on surveillance video recovered from that store, and has been identified by W-20 who saw him in the store that day.

### C. Ortega-Hernandez's Attack on the White House

Later that night, shortly before 9:00 PM, Ortega-Hernandez was driving his car westbound on Constitution Avenue when he stopped directly across the Ellipse from the South Lawn of the White House. With the passenger-side window of his car lowered, he pointed his semi-automatic assault rifle out the window of the car and aimed directly at the White House. The defendant opened fire on a residential section of the White House, and then fled the scene in his car, driving erratically and at a high rate of speed.

Moments later, the defendant crashed his vehicle near the ramp from Constitution Avenue to the Theodore Roosevelt Bridge in front of the U.S. Institute of Peace. After efforts to restart the vehicle failed, Ortega-Hernandez quickly ran from the car on foot, leaving behind many personal possessions. Law enforcement officers who later searched the car recovered the following items, among others:

---

[3] At the time of the stop, Ortega-Hernandez refused to allow the officers to search his 1998 black Honda Accord.

- A Romanian Cugir SA semi-automatic assault rifle with a large scope mounted on the top portion of the weapon and a magazine attached to it;[4]

- Three magazines fully-loaded with an additional ninety-three 7.62 x 39 mm cartridges; the Federal Bureau of Investigation ("FBI") conducted a fingerprint analysis of these magazines and found ten latent prints of value on two of the magazines. All ten of these latent fingerprints have been identified as fingerprints of Ortega-Hernandez;

- Twelve spent shell casings for 7.62 x 39 mm cartridges; the FBI has conducted an assessment of these spent shell casings and has concluded that all twelve were fired from Ortega-Hernandez's rifle;

- Five boxes of 7.62 x 39 mm cartridges;

- A black hooded Los Angeles Dodgers jacket identical to the one Ortega-Hernandez had been photographed wearing earlier that day in Arlington County, Virginia; and

- The receipt from the Fairfax, Virginia, Walmart store, where Ortega-Hernandez had been at approximately 4:45 p.m. that day.

The car itself was registered to Ortega-Hernandez and one other person.[5]  Soon after law enforcement identified the defendant as one of the owners of the vehicle, he became the subject of a multi-agency manhunt that crossed several jurisdictions.

Following the shooting on November 11, 2011, the FBI searched the area around the White House and located more than five confirmed bullet impact points on the south side of the building on or above the second story. That area of the White House is widely known to be the residence of the First Family. Two bullets were also recovered from the White House: one from a window frame on the Truman Balcony and one found on the ground east of the entrance. The

---

[4] The weapon was registered to W-12 and was purchased at a gun store in Idaho Falls, Idaho. W-12 has identified this weapon as the same weapon W-12 sold to Ortega-Hernandez on March 19, 2011, except for the addition of the after-market scope. W-13 has stated that this rifle is the one on which W-13 installed a scope kit at the request of Ortega-Hernandez.

[5] The FBI has conducted an analysis of the interior of the car for latent fingerprints. The FBI identified three latent prints of value inside the car: one on the driver's side door handle, one on the driver's seat belt side, and one on a dietary supplement bottle. All three of those latent fingerprints have been identified as fingerprints of Ortega-Hernandez. No other latent fingerprints were recovered from the vehicle.

FBI concluded that both of those bullets were fired by Ortega-Hernandez's weapon. The FBI also recovered a bullet jacket that was found in the window sill of the Truman Balcony, which it has also concluded was fired from Ortega-Hernandez's weapon.[6]

### D. Ortega-Hernandez's Flight

Following the shooting, on November 14, 2011, W-18 was in the area of Shenandoah Junction, West Virginia, photographing trains. W-18 is a former FBI photographer who takes photographs of cargo trains as a hobby. W-18 noticed an individual riding inside one of the empty hopper cars. W-18 thought this was rare and took a picture. Later, W-18 noticed that the stowaway he had photographed looked like Ortega-Hernandez and contacted law enforcement. Subsequently, associates of Ortega-Hernandez have viewed that photograph and have confirmed that this photograph is one of Ortega-Hernandez. The cargo train that Ortega-Hernandez had boarded was headed northwest from Washington, D.C.

### E. Ortega-Hernandez's Arrest and Mental Health Examination

On November 16, 2011, Ortega-Hernandez was arrested on a warrant by Pennsylvania State Police ("PSP") troopers, at the same hotel where he had stayed with W-16 and W-17 the previous week in Indiana, Pennsylvania.

The defendant first appeared in this district on November 21, 2011, before United States Magistrate Judge Alan Kay. At the defendant's initial appearance, the government requested a forensic psychiatric examination of the defendant. The defense objected to the government's request, claiming that the defendant is competent. Magistrate Judge Kay ordered an examination be conducted by the psychiatric staff of the Legal Services Division of the District of Columbia's Department of Mental Health.

---

[6] Several fragments were also collected in that area but could not be identified or eliminated as having been fired from that rifle.

On November 22, 2011, Dr. Elizabeth Teegarden conducted a mental health examination of the defendant. Dr. Teegarden's examination was conducted at the cellblock of the courthouse, and consisted of a fifty-minute interview of the defendant. In the interview, the defendant stated "he has not experienced any auditory or visual hallucinations and denied delusional thinking." Letter from Dr. Elizabeth Teegarden to the Honorable Alan Kay, at 2 (Nov. 22, 2011) [hereinafter "Teegarden Ltr."]. Dr. Teegarden also wrote that "[the defendant's] discussion of world events did not appear to be influenced by delusional ideation." Id. at 3. Dr. Teegarden also wrote, "[t]here was also no overt evidence of, and he denied, phobias, bizarre thought content, or suicidal/homicidal ideation or intent." Id. Dr. Teegarden noted that "[t]he defendant's attention, concentration, mathematical and abstract thinking abilities appeared unimpaired. His memory for recent and remote events seemed intact, as did his immediate and delayed recall." Id. Finally, Dr. Teegarden noted that Ortega-Hernandez "emphatically denied past mental health treatment or previous or current psychiatric symptoms." Id.

Following her examination, Dr. Teegarden concluded that "Mr. Ortega-Hernandez is presently mentally competent to stand trial because mental health factors do not substantially impair his capacity to have a factual and rational understanding of the proceedings against him and to properly assist counsel with the preparation of his defense." Id.

## ARGUMENT

Courts have held that a criminal defendant may seek to introduce evidence of a diminished mental capacity or cognitive impairment at trial if that evidence is admitted to negate the specific intent element of a crime. See United States v. Brawner, 471 F.2d 969, 1002 (D.C.

Cir. 1972). [7] Diminished mental capacity evidence "is admitted not as an affirmative defense to excuse the defendant from responsibility for his acts, but to negate specific intent when that is an element of the charged act itself." United States v. Childress, 58 F.3d 693, 728 (D.C. Cir. 1995) (emphasis in original). Unlike an affirmative insanity defense, a defendant asserting diminished mental capacity does not dispute either his physical control at the time of the criminal act or his appreciation of the wrongfulness of the criminal act. United States v. Gold, 661 F.Supp. 1127, 1129-1131 (D.D.C. 1987) (citing Brawner, 471 F.2d at 998). Instead, a defendant claiming a diminished capacity defense must establish that a diminished mental capacity or cognitive impairment somehow prevented the defendant from forming the requisite *mens rea* to commit the charged offense. Childress, 58 F.3d at 728; see also United States v. Cameron, 907 F.2d 1051, 1060 (11th Cir. 1990); United States v. Rezaq, 918 F. Supp. 463, 469 (D.D.C. 1996).

To present a diminished capacity argument at trial, the defendant must seek to admit a mental health expert's "'diagnoses, the facts upon which those diagnoses are based, and the characteristics of any mental diseases or defect the experts believe the defendant possessed during the relevant time period,' staying clear of 'directly or indirectly opining on the ultimate issue of specific intent.'" Childress, 58 F.3d at 728 (quoting Gold, 661 F.Supp. at 1131). As the D.C. Circuit has explained, "[e]xpert psychiatric testimony negativing blame-worthiness for a crime – whether on the grounds of general exoneration or lack of requisite specific intent – must rest on the premise of an exception due to abnormal mental condition." Brawner, 471 F.2d at 1002.

---

[7] While the reasoning of Brawner related to insanity was superseded by the Insanity Defense Reform Act of 1984, as recognized in Shannon v. United States, 512 U.S. 573 (1994), Brawner's approach regarding diminished mental capacity remains intact in the D.C. Circuit. See e.g., United States v. Childress, 58 F.3d 693, 730 (D.C. Cir. 1995); United States v. Rezaq, 918 F. Supp. 463, 469 (D.D.C. 1996); United States v. Gold, 661 F.Supp. 1127, 1129-31 (D.D.C. 1987) (discussing the legislative history and purpose of the Insanity Defense Reform Act and concluding that it does not supersede Brawner with regards to diminished mental capacity for specific intent crimes); United States v. Shorter, 618 F. Supp. 255, 259 (D.D.C. 1985).

Prior to introduction of expert testimony on an abnormal mental condition to a jury, the Court must "determine whether the testimony is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in reaching a decision on the ultimate issues," id., rather than a "dangerously confusing theory of defense more akin to justification and excuse." Childress, 58 F.3d at 730. Moreover, evidence establishing diminished mental capacity or a cognitive impairment is only admissible in relation to specific intent crimes; "when a defendant is charged with a general intent crime…evidence concerning a defendant's mental condition becomes irrelevant and confusing to a jury." United States v. Hardy, 730 F. Supp. 1141, 1143 (D.D.C. 1990).[8]

Applying the principles outlined above to the instant case, the Court should exclude evidence and preclude any arguments offered by Ortega-Hernandez that attempt to establish that he suffers from a diminished mental capacity or any other cognitive limitations, which rendered him unable to form the specific intent necessary to commit crimes for which he is charged in the Indictment. First, Ortega-Hernandez has not established that he currently or in the past suffered from any diminished mental capacity or other cognitive limitations. In fact, Ortega-Hernandez "emphatically denied past mental health treatment or previous or current psychiatric symptoms." Teegarden Ltr. at 3. The defendant also further denied that he had ever suffered from any "phobias, bizarre thought content, or suicidal/homicidal ideation or intent," and "has not experienced any auditory or visual hallucinations and denied delusional thinking." Id.

---

[8] Because evidence or arguments establishing diminished mental capacity are "irrelevant and confusing" with respect to general intent crimes, United States v. Hardy, 730 F. Supp. 1141, 1143 (D.D.C. 1990), the Court should exclude such evidence and arguments raised by the defense with respect to the general intent crimes charged in the Indictment. This motion concerns only the specific intent crimes charged in the Indictment, the most serious of which is Count One, Attempt to Assassinate the President of the United States, in violation of Title 18, United States Code, Section 1751(c).

Ortega-Hernandez's claims are consistent with the findings of Dr. Teegarden, the licensed clinical psychologist who examined him, who found Ortega-Hernandez to be "alert, pleasant, cooperative, fully oriented, and in no acute distress." Id. at 2. Specifically, Dr. Teegarden found that Ortega-Hernandez's "attention, concentration, mathematical and abstract thinking abilities appeared unimpaired. His memory for recent and remote events seemed intact, as did his immediate and delayed recall." Id. at 3. She further found that the defendant "did not appear to be influenced by delusional ideation." Id. Dr. Teegarden therefore concluded that "mental health factors do not substantially impair his capacity to have a factual and rational understanding of the proceedings against him and to properly assist counsel with the preparation of his defense." While Dr. Teegarden's findings related to the defendant's competency, her examination did not uncover any mental health issues, let alone any diminished mental capacity, cognitive limitation, or abnormal mental condition. Accordingly, absent such evidence of diminished mental capacity, cognitive impairment, or abnormal mental condition, all evidence and arguments related to diminished capacity should be precluded.

Second, the defense has not provided any notice to the United States that it intends to introduce expert scientific evidence related to Ortega-Hernandez's mental condition as required pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure. Specifically, Rule 12.2 requires the defense to notify the United States in writing by the time provided for filing a pretrial motion if it intends to introduce expert scientific evidence relating to the mental condition of the defendant. F.R.C.P. 12.2(b). Rule 12.2(d) provides that court "may exclude any expert evidence from the defendant on the issue of the defendant's mental disease, mental defect, or any other mental condition bearing on the defendant's guilt" if the defense failed to give notice to the United States. The United States respectfully submits that in light of the

defendant's failure to provide any expert notice, the Court should preclude the defendant from presenting any expert scientific evidence with respect to Ortega-Hernandez's mental condition. [9] Accordingly, absent such expert scientific evidence, the defendant cannot establish a diminished mental capacity or cognitive impairment prevented him from forming the requisite *mens rea* to commit the charged offenses. Therefore, all evidence and arguments related to diminished mental capacity should be precluded on this ground as well.

---

[9] The defense has also failed to provide notice of any expert witnesses of any kind as required pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure. Specifically, Rule 16(b)(1)(C) states "[t]he defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial" if the defendant had requested the same from the United States. F.R.C.P. 16(b)(1)(C) (emphasis added). In this case, the defendant repeatedly requested expert notice from the United States, which was provided in letters dated April 8, 2013 and June 25, 2013. In turn, the United States made requests to the defense for expert notice under Rule 16(b)(1)(C) in letters to the defense on March 12, 2012 and January 8, 2013. No expert notice has ever been provided to the United States. Accordingly, the United States submits that the defense should be precluded from presenting any expert evidence at trial in this case. See F.R.C.P. 16(d)(2)(C).

## CONCLUSION

Because there is no evidence that Ortega-Hernandez has currently or in the past suffered from any diminished mental capacity or any other cognitive limitations, and because the defendant has failed to provide timely notice of any expert scientific evidence related to Ortega-Hernandez's mental condition that will be presented at trial as required pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure, the United States respectfully requests that this Court exclude all evidence and preclude any arguments that attempt to establish that defendant has a diminished mental capacity or cognitive impairment that prevented him from forming the requisite *mens rea* to commit the charged offenses.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar No. 447-889

By: _____
GEORGE P. VARGHESE
Special Assistant United States Attorney
ALESSIO D. EVANGELISTA
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, DC 20530
(617) 748-3237 (Varghese)
(202) 252-7247 (Evangelista)