UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | : | Cr. No. 12-14 (RMC) |
| V. | : | |
| OSCAR RAMIRO ORTEGA-HERNANDEZ | : | |
| Defendant. | : | |

DEFENDANT'S MOTION TO PRECLUDE
GOVERNMENT FROM INTRODUCING EVIDENCE OF
IRRELEVANT AND PREJUDICIAL OUT OF COURT EXPERIMENTS

**INTRODUCTION**

Defendant Oscar Ortega Hernandez moves this Court to preclude the Government from introducing evidence of certain "experiments" conducted by the Federal Bureau of Investigation ("FBI") with the rifle allegedly used to fire shots at the White House on November 11, 2011. As set forth herein, on two occasions: (1) December 12, 2011; and (2) March 15, 2013, the Government "test fired" the rifle under conditions radically different than those which existed at the time of the alleged shooting in this case. In the Government's experiments an FBI marksman shot at paper targets from a stationary position after replacing the existing rifle scope. Indeed, in the second experiment, the agent took several shots to adjust for distance and elevation with the weapon before firing at the target. The only thing these experiments established is that the weapon recovered from Ortega's vehicle could not hit, in the vernacular – "the broad side of a barn."

Notwithstanding, the prosecutors apparently intend to introduce testimony concerning the test fires and the paper "targets" themselves into evidence – for reasons that are not at all clear to the defense. Notwithstanding the prosecution's purpose, as set

forth more fully herein, the Government cannot satisfy its burden of establishing that the experiment conditions were "substantially similar" to the actual conditions in order to justify admission of the testimony and/or physical evidence. See United States v. Baldwin, 418 F.3d 575, 579-81 (6th Cir. 2005). Moreover, any such testimony and/or evidence would invariably confuse the jury and be unfairly prejudicial to the defendant. Accordingly, this evidence should therefore be precluded pursuant to the provisions of Fed. R. Crim. Pro. 403.

## BACKGROUND

The Government alleges that on November 11, 2011, defendant Oscar Ortega-Hernandez was involved in an incident in which shots were fired at the White House. According to the Government:

[s]hortly before 9:00 P.M., Ortega-Hernandez was driving his car westbound on Constitution Avenue when he stopped directly across from the Ellipse from the South Lawn of the White House. With the passenger-side window of his car lowered, he pointed his semi-automatic assault rifle out of the window of the car and aimed directly at the White House.

Gov. Motion Other Crimes Evidence, DE 30 at pp. 3-4.

The U.S. Park Police recovered an AK-47 from Ortega-Hernandez' vehicle and the weapon was ultimately placed in FBI custody. As part of the investigation into this case, the FBI conducted various experiments with the weapon. According to a crime scene analysis conducted by the Park Police, the distance from Constitution Avenue to the White House was between approximately six hundred and forty-one (641) to six hundred and fifty-three (653) yards. See emails dated December 9, 2011 and February 8, 2012 attached hereto as Exhibit 1.

1. <u>The December 12, 2011 Test Fire Experiment</u>

On December 12, 2011, FBI agent Scott Patterson fired numerous rounds from the rifle recovered from defendant Ortega's vehicle. The test fire was conducted at the FBI Ballistic Research Facility in Quantico, Virginia. The weapon that was given to agent Patterson had two sighting devices affixed: a laser sight and a conventional sight. Prior to firing the weapon, the agent conducted an "initial accuracy assessment." According to a report prepared of the test fire, before the weapon was fired, the "batteries [for the laser site] had to be replaced, which involved some disassembly of the mounting system, so we have no guarantee that it went back exactly as it was." The report further noted that at a distance of only twenty-five (25) yards away using the laser sight, the "**shots deviated significantly**." The agent then tested the weapon with the conventional scope and again at twenty-five (25) yards away, the weapon "**deviated significantly** from the aim point" (emphasis added).

The agent thereafter mounted a "high quality rifle scope" on the weapon, which was fired at a target one hundred (100) yards away. With the high quality scope, the rifle was able to hit the target. No effort, however, was made to fire the weapon from the distance at which shots were allegedly fired at the White House - approximately seven hundred (700) yards away. A copy of a January 20, 2013 email and other relevant documents describing these events is attached hereto as Exhibit 2.

It appears that shortly after this experiment took place, the investigating agents questioned why the weapon had not been fired from a distance of seven hundred yards away. On February 2, 2012, FBI Special Agent Douglas Murphy (who has been designated as a potential expert witness for the Government in this case) wrote to the lead

3

investigatory agent concerning this matter, explaining that they could not extrapolate from the existing experiment as to how the rifle would perform at that distance. SA Murphy explained as follows:

> I received your phone message regarding firing the rifle at 700 yards, but first would like to inform you of the decision we made regarding what I can report/testify to. Myself, the Quality Assurance Manager and the UC discussed the work that had to be done and the nature of the requests and determined that **due to the specialized nature of accuracy testing and the lack of specific training or protocols in that area for examiners** in the FTU [Firearms Training Unit], I cannot report the group sizes or the accuracy implications of them. . . . I can report that test fires were shot at 25 and 100 yards with 2 different scopes and the laser sight, but that's about it (emphasis added).

A copy of the February 2, 2012 email is attached hereto as Exhibit 3.

2. The March 15, 2013 Test Fire Experiment

Approximately one year later, on March 15, 2013, the FBI subjected the weapon to another round of experimentation, this time, for the purpose of determining how the weapon might fire at a target located 700 yards away.

Prior to firing any rounds, Special Agent Patterson affixed a new scope to the weapon – this time a "Ballistic Research Facility Leupold Vari-x III, 20 x 50 long range scope."[1]  Next, the agent made certain "elevation adjustments" and fired several shots for distance using the "Mil-dots" in the scope. The report of the shooting (attached hereto as Exhibit 4) does not state whether the agent fired from the standing or prone position, but after adjusting the scope, he aimed at the center of the target, fired a shot and missed. According to the report prepared by the agent, he then "held the vertical stadia line on the left edge of the target as opposed to centered on the target while maintaining the same

---

[1] The undersigned conducted a brief internet search for information concerning the scope and was able to determine that: (1) using a long range scope seems a complicated matter, as described in the "Leupold Ballistics Aiming System" guide attached hereto as Exhibit 4; and (2) purchasing a scope is an expensive matter as the particular model used by the FBI sells for approximately $1,000.00 on ebay.

elevation hold," fired ten additional rounds – of which eight hit the target – in a pattern spread across 57 ½ inches – or more than four feet across.

As set forth in the remainder of this memorandum, the results of these "experiments" should not be admitted into evidence because the circumstances surrounding the shooting at the FBI firing range are so distinct – in every possible way - from those which allegedly took place on November 11, 2011 that the evidence is irrelevant and unfairly prejudicial.

## LEGAL ANALYSIS

There is little case law concerning the admissibility of out of court experiments in criminal cases in this jurisdiction. A review of the law generally reveals that the courts have imposed a "substantially similar requirement" before admitting such evidence. See United States v. Baldwin, 418 F.3d 575, 579-81 (6th Cir. 2005); United States v. Birch, 39 F.3d 1089, 1092-93 (10th Cir.1994); United States v. Russell, 971 F.2d 1098, 1106 (4th Cir. 1992). But the caselaw is also clear that the admissibility of the experiment must be assessed in relation to the "purpose" for which the evidence is introduced. See Jones v. Ralls, 187 F.3d 848, 853 (8th Cir.1999). Thus, for example, if the purpose of the experiment is to recreate an event, the timing and physics of which are critical, courts will only admit evidence of experiments that are conducted under nearly identical conditions as the actual event. See, e.g., Jackson v. Fletcher, 647 F.2d 1020, 1026-28 (10th Cir.1981)(district court erred by admitting evidence of accident reconstruction experiment to determine the precise speed of the truck at the time of collision, when simulation truck was empty whereas the actual truck carried a full load).

In this case, the Government appears to seek the introduction of testimony concerning these out of court experiments and physical evidence – including the paper targets - in order to imply that the defendant had the capacity - or perhaps, the "intent" - to shoot at the White House. Under the circumstances presented here, the Government should be completely foreclosed from presenting this evidence before the jury.

As an initial matter, the experiments conducted by FBI agent Patterson were done under what can be fairly described as wildly different circumstances. For the December 12, 2011 test fire, the agent first removed and then reattached the "laser scope" to the rifle (after replacing the batteries), which in his own words meant that he could not "guarantee" it went back as it was originally. The agent thereafter fired the weapon while standing upright. Using both the laser and the regular site, the weapon "deviated substantially" from its aim point from only twenty-five yards away. All this experiment demonstrates is that the weapon recovered from the defendant's vehicle would have been essentially useless when sighted – since Ortega-Hernandez allegedly shot at the White House from approximately six hundred and fifty yards away while driving a vehicle and shooting out the passenger side window. Agent Patterson later concluded that he could not offer any opinion about the weapon's efficacy at a distance of seven hundred yards away due to a "lack of specific training or protocols."

The March 15, 2013 experiment fares even worse. For this event, agent Patterson utilized a completely different, high powered (and expensive) scope to fire at the target. In order to calibrate the scope, he calmly fired several round to establish distance and elevation – factors that could not possibly be more different than the circumstances of the alleged offense.

Given the drastically different conditions between the experiment and the alleged actual shooting conditions, it is clear that this evidence would not assist the jury in resolving any issue presented for its consideration. If the Government seeks to prove that the weapon recovered from Oscar Ortega-Hernandez's vehicle was theoretically capable of firing a round seven hundred yards away, then presumably the FBI can conduct a neutral experiment to establish that fact. But testimony concerning the use of the rifle after changing the scopes and calibrating the weapon and having an FBI marksman fire at paper targets have absolutely nothing to do with the issues that will be presented for the jury to consider in this case. Indeed, in a very real sense, the experiments are more exculpatory than not, since they show that the gun recovered from Ortega's vehicle was essentially useless for even targeting objects as close as twenty-five yards away.

This Court has previously acknowledged its gatekeeping role pursuant to Fed. R. Crim. Pro. 403 to exclude evidence whose probative value is merely "outweighed," not "substantially outweighed" by prejudice concerns. United States v. Gooch, 2007 WL 3780781 at p. 8 (D.D.C.)(Collyer, J.). The Court should determine that this evidence raises the possibility of unlimited prejudice if presented by the Government and heard by the jury in this case.

Finally, to the extent that the Government has some secondary or hidden agenda to use this testimony and/or evidence for the purpose of somehow establishing that the defendant had the intent to attempt to assassinate the President, the evidence would be absolutely inadmissible. See United States v. Naegele, 471 F.Supp.2d 152, 169 (D.D.C. 2007)(expert testimony not admissible to prove intent in criminal case).

## CONCLUSION

For all of the foregoing reasons, the defense respectfully requests that any and all testimony concerning the experiments conducted by the FBI with the weapon allegedly recovered from defendant Oscar Ortega-Hernandez's vehicle be excluded from evidence.

Respectfully submitted,

*Robert Feitel*

_____
Robert Feitel
1712 N Street, N.W.
Washington, D.C.  20009
D.C. Bar 366673
202-450-6133 (office)
202-255 6637 (cellular)
RF@RFeitelLaw.com

On behalf of the Oscar
Ortega-Hernandez Trial Team

CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing was sent, via the Electronic Filing System to all attorneys of record at the United States Attorney's Office for the District of Columbia, 555 4th Street, N.W., Washington, D.C., 20001, on this 6th day of August, 2013.

*Robert Feitel*

_____
Robert Feitel