UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                            :     Cr. No. 12-14 (RMC )

V.                                   :

OSCAR RAMIRO ORTEGA-HERNANDEZ    :

Defendant.                           :

### DEFENDANT'S MEMORANDUM CONCERNING THE UNCONSTITUTIONAL APPLICATION OF THE TERRORISM ENHANCEMENT

### INTRODUCTION

In advance of sentencing, the defense submits this memorandum concerning the unconstitutional application of the so called "terrorism enhancement" in this case pursuant to Section 3A1.4(a) of the Federal Sentencing Guidelines. This enhancement applies to convictions that are intended, *inter alia*, to "influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." See 18 U.S. Code Section 2332(b)(g)(5)(A).

As set forth herein, in this case the Government has attempted to usurp the judiciary's constitutionally delegated responsibility for determining relevant sentencing facts by insisting as a condition of pleading guilty that the defendant accept the imposition of the terrorism enhancement, with its resulting exponential increase of twelve (12) guideline levels and a criminal history category of VI – which blasts his guideline range from 30 months to 210 months. The Government refused all efforts to have the application of the enhancement decided by the Court, even though there is significant doubt that it applies to Oscar Ortega's conduct.

1

The magnitude of this constitutional violation is clearly demonstrated by the Government's decision in another recent case before this very Court captioned <u>United States v. Reel</u>, 13 Cr. 196. Defendant Reel launched a premeditated attack on the White House, its occupants and the Secret Service agents guarding the building to retaliate against Government policy. Even though on their face, these facts directly implicate the terrorism enhancement, the prosecution did not mention the adjustment in its plea agreement with Reel, did not insist that he accept the enhancement, and did not argue for its application at the time of sentencing. Instead, the parties reached an agreement for a thirty-five month sentence.

It seems that the Government has intentionally attempted to manipulate the guideline calculation in this case to reach some sentencing "target" of its own choosing. This coerced acceptance of the enhancement and the intentionally disparate treatment of similarly situated defendants is arbitrary on its face and violates defendant Oscar Ortega's due process rights. Moreover, because the Government plea offer in this case also demands a waiver of virtually all direct appellate rights, the failure to raise this violation before this Court may preclude the defendant from preserving his constitutional challenge to this due process violation. The defense does not argue herein that the enhancement can never apply in this case, but rather that due process requires that this Court undertake an independent review of the facts to determine if it applicable to the defendant's conduct.

**FACTUAL BACKGROUND**

In order to provide perspective on the defendant's claim, the following section summarizes and compares the facts of this case and the <u>Reel</u> prosecution.

1. <u>Oscar Ortega Plea Agreement and Facts</u>

On September 18, 2013, Oscar Ortega pled guilty to two counts of the Superseding Indictment: (1) count five which charges destruction of property (to the White House): and (2) count eleven which charges using a firearm during a crime of violence. In essence, the defendant admitted that he drove past the White House the evening of November 11, 2011 and fired several rounds at the building. Oscar then tried to flee the scene, but crashed his car and ran off on foot, leaving behind the weapon, identification and other evidence that connected him to the event. He was captured five days later in Indiana, Pennsylvania.

There was enormous publicity about these events in the press; indeed Oscar Ortega was frequently identified in the press as the "White House shooter." It is notable, however, that he did not plead guilty to any of the counts alleging an assault against the President or the Secret Service agents on duty that evening.

As part of the "Statement of Facts" drafted by the prosecutors in support of the guilty plea in this case, the Government included a litany of statements Oscar made. The defense assumes that the ostensible purpose of the inclusion of these facts was to support the terrorism enhancement because they are in no way relevant to the destruction of property count. The following is a summary of the statements attributed to the defendant that are remotely relevant to the issue of Governmental policy.

First, beginning in 2010, Oscar began to make statements to his friends in Idaho demonstrating his "contempt" for the federal government and explained that the government was seeking to "implant Global Positioning System chips" in children. Second, in a video Oscar recorded on September 16, 2011, he made the following statements: (1) the inclusion of fluoride in toothpaste and aspartame in our food by the

FDA was designed to "dumb us down;" (2) the Government has made smoking marijuana illegal because if everyone smoked marijuana we would be smarter and "it would be harder to deceive us;" and (3) the United States is in a war for being "greedy" about oil and is also involved in a war on drugs.

Third, Oscar made a video on October 23, 2011, before leaving Idaho to travel to Washington, D.C. In the video he noted that the United States had troops in Iraq for years in case any of the Iraqi people want to "mess up our plan to steal their oil." Oscar concludes by noting that he was a "cold hearted warrior of God" and that it was time for a "revolution."

The prosecution focused exclusively on these statements in an effort to satisfy the "motivational" element of the terrorism enhancement. The Government also knows full well, however, that Oscar Ortega had an independent motive for traveling to Washington, D.C. As the result of its investigation, the FBI agents and prosecutors in this case learned that in the year before his trip to Washington, D.C. Oscar Ortega had been exposed to various apocalyptic literature and movies, and websites. As the result of his youth, immaturity, and impressionable nature, Oscar had become convinced that the so called "end of times" was fast approaching. Driven by the fear that the world was ending (and that his young son would be raised in chaos) Oscar traveled to Washington, D.C. in order to warn others of the pending global crisis. In his desperation and confused state of mind, Oscar concluded that he had no other way to send a message that anyone would listen to other than to take some dramatic action. Unfortunately, this confused thinking – which

Oscar now recognizes was wrong - led to his arrest and conviction in this case. [1] The

Government is well aware of these facts - FBI agents conducted in depth interviews with

numerous persons who described Oscar's fascination with the doomsday scenario and his

fear of the coming apocalypse. Yet, not a single one of these events was included by the

Government in the guilty plea statement of facts.

A comparison of the facts of Oscar Ortega's case with the events surrounding the

subsequent attack by Joseph Reel on the White House reveals the symmetry of the events

but the possibility of totally different outcomes because of the Government's

manipulation of the federal sentencing guidelines.

2. <u>Defendant Joseph Reel's Attack On the White House</u>

In the early morning hours of June 9, 2013, Joseph Reel launched a planned attack

against the White House and the Secret Service agents assigned to guard the President.

First, Reel stationed himself a few blocks from the White House and made a false 911

call, claiming that Secret Service agents were planning to stage an attack in front of the

White House so that other agents in California could "take Obama down." The call was

made with the intention of distracting the Secret Service detail on duty at 1600

Pennsylvania Avenue. Almost immediately thereafter, Reel launched the second phase of

his attack.

According to the Government's summary of the evidence (contained in its motion

to detain Reel without bond) he specifically aimed his Jeep Patriot SUV at one of the

occupied guard booths that surround the White House. Reel had equipped the vehicle

with a home made device designed to keep the car's accelerator engaged even though he

---

[1] The defense has received a first draft of Oscar's psychological assessment by Dr. Robert Madsen, which will be filed when the document is finalized. The Report directly addresses Oscar's motivation for traveling to Washington, D.C.

was not physically present in the vehicle and then tied the steering wheel in place. The Jeep was sent speeding down Pennsylvania Avenue, N.W. directly towards the front of the White House Complex at approximately thirty-five to forty miles an hour. The vehicle collided with a light post and one of the steel barriers surrounding the building. The Secret Service would later recover from the Jeep: (1) 100 rounds of live .45 caliber ammunition; (2) 100 rounds of .22 caliber ammunition; (3) eight knives; (4) two machetes; (5) a hand held "spotting scope," and other miscellaneous items.

With his second distraction in place, Reel then rode on a bicycle to the White House Complex and jumped over the fence adjacent to the Old Executive Office Building. He ignored the order of a uniformed Secret Service officer to stop and was finally apprehended approximately forty feet away from the fence that constitutes the inner perimeter of the White House residence. At the time of his arrest, Reel claimed that he intended to spray paint the words "don't tread on me" as a "symbolic gesture." Notwithstanding, the police recovered, *inter alia*, a pocket knife, fingerless gloves, and a "handcuff key" during a search incident to arrest. A subsequent search of Reel's apartment in Ohio residence resulted in the seizure of the following: (1) a Glock .45 caliber pistol; (2) a Taurus .22 caliber handgun; (3) four hunting knives; (4) a "spear;" (5) a "sword;" (6) one baseball bat with "spikes" affixed to the barrel; (7) two ballistic masks; (8) a gas mask; and (9) a metal face shield.

Further investigation would establish that Reel had posted a video on the website "YouTube" in which he advocated shooting people and police officers and telling people to rise up against the Government. The chilling particulars of the video include the allegation that the IRS destroyed the "tea party" and the Department of Homeland

Security is purchasing ammunition and "tanks" to be used "domestically against us." Reel then encourages people to round up their friends and travel in vehicles "modified for combat" in order to "crush everything that gets in your way." Reel then offers "one million dollars in compensation – compensation for every confirmed kill of every enemy of this nation." Reel then identifies who these enemies are: "anyone wearing black armored uniforms and . . . any soldier and law enforcement that doesn't stand down, or refuses to stand with us . . . they're also fair game."

Reel was originally charged by complaint with destruction of property, in violation of 18 U.S. Code Section 1361. The Government subsequently entered into a plea agreement with this defendant that charged him Assaulting an Officer of the United States With a Dangerous Weapon, in violation of 18 U.S. Code 111(b) for his premeditated attack against the White House grounds. Even though the assault count carries a maximum punishment of up to twenty (20) years, the plea agreement – which was presented and accepted by this Honorable Judge – was pursuant to Fed. R. Crim. P. 11(c)(1)(C) and provided for an agreed upon sentence of thirty-five months of incarceration. The plea agreement makes absolutely no mention of the terrorism enhancement. [2]

Thus, defendant Reel – whose charge was increased from destruction of property to an armed assault against a uniformed member of the Secret Service – was allowed to plead guilty with an agreement to serve less than three years in jail (minus good time

---

[2] Federal Rule of Criminal Procedure 11(c)(1)(C) permits the parties to agree that a particular sentence is appropriate, but that recommendation is subject to judicial approval for reasonableness. Freeman v. United States, 131 S.Ct. 2685, 2692 (2011). The district courts are directed to identify the presumptive guideline range in deciding whether to accept the plea agreement. United States v. Godall, 236 F.3d 700, 705 (D.C. Cir. 2001). See, e.g., Casseday v. United States, 763 F.Supp.2d 42, 48 (D.D.C. 2011)(agreed upon sentence may depart from Guidelines for justifiable reasons).

credit). In sharp contrast, in this case Oscar Ortega's charge was reduced from the attempted assassination of the President, to destruction of property, but the Government structured the plea agreement to require the imposition of the terrorism enhancement, his guideline goes from Level 17 (24-30 months) to Level 32 (121-151 months).

Moreover – and more importantly – the manner in which these vastly different possible outcomes were presented to the court raises serious questions about the role of prosecutorial power under the federal sentencing guidelines. It appears from the public record that the possible application of the terrorism enhancement was not even raised by the Government in the Reel case. For Oscar Ortega, the enhancement was a condition to any guilty plea. This gross disparity violates the due process clause.

**LEGAL ANALYSIS**

1. Unchecked Prosecutorial Power
   Under The Federal Sentencing Guidelines

It is neither hyperbole nor exaggeration to note that since the implementation of the Federal Sentencing Guidelines in 1989, prosecutors have sought to acquire virtually unchecked power with respect to the terms and conditions of plea agreements in federal court. See, e.g., United States v. Booker, 534 U.S. 220 290, n.11 (2005) ("there is widespread frustration with the power and discretion held by prosecutors under the guidelines and that guidelines are manipulated through plea agreements")(*Justices Stevens, Souter, and Scalia dissenting in part*)(internal quotations omitted).

Other judges – including those in this judicial Circuit - have been more candid in their condemnation of the role of federal prosecutors in the plea bargaining process under the federal sentencing guidelines. In United States v. Harrington, 947 F.2d 956 (D.C. Cir.

1991), Judge Edwards decried the power vested with prosecutors under the guidelines, noting that despite the laudable goals of sentencing guidelines:

> We also have come to understand that the Guidelines do not, by any stretch of the imagination, ensure uniformity in sentencing. Assistant U.S. Attorneys ("AUSAs") have been heard to say, with open candor, that there are many "games to be played," both in charging defendants and in plea bargaining, to circumvent the Guidelines.
>
> . . . . . .
>
> The inequity wreaked in this case is endemic to the Guideline system. The appellate cases show a disparity between the relative ease of upward departure and the niggardly application of downward adjustments.

947 F.2d at 964, 968 (concurring). Judge Harold Greene of this district court bench noted the opportunity the guidelines presented for abuse by the Executive. "[E]ffective control of sentencing - from time immemorial in common law countries a judicial function - has effectively slipped, at least in some cases . . . . to the realm of the prosecution. . . . This development denies due process and is intolerable in our Constitutional system." United States v. Shepherd, 857 F.Supp. 105 (1994).

The danger of unchecked prosecutorial power is no more evident than with respect to the imposition of the so called "terrorism enhancement." The enhancement applies not merely to those offenses that would be automatically recognized as relating to terrorism, but to a litany of crimes which are purely domestic in nature and which bear no real relationship to terrorism as the term is commonly understood. Rather, the enhancement applies to an offense which is: (1) calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (2) is a violation of certain enumerated offenses, including the destruction of property count in this case. See 18 U.S. Code Section 2332b(g)(5)(B)(i).

The enhancement mandates an exponential increase in the presumptive sentence, raising the base guideline offense calculation by twelve levels (or to no less than level thirty-two) and imposing by fiat a Criminal History of Category VI against the defendant. Moreover, the enhancement is not applied incrementally, but is an all or nothing event. In this case, it changes the starting point in the guidelines calculation for the destruction of property count from 30 months to 210 months – or a seven-fold increase. It is an understatement to note that its effect is "unequivocally severe." United States v. Benkahla, 501 F.Supp.2d 748, 751 (E.D. Va. 2007)(Cacheris, J.).

2.      Due Process Was Violated By The Defendant's
        Forced Agreement To The Terrorism Enhancement

It is well settled that the due process clause applies to "the sentencing process." Gardner v. Florida, 430 U.S. 349, 358 (1977)(plurality). Due process acts as a limitation on prosecutorial discretion by requiring that "the sentencing process itself, including any discretion exercised by the prosecutor in selecting the charge or charges, **must be free from arbitrariness or bad faith**." United States v. Cobbins, 749 F.Supp. 1450, 1457 (E.D. La. 1990) (emphasis added) (*relying on United States v. Roberts*, 726 F.Supp. 1359)(D.D.C. 1989)(Greene, Harold). Moreover, "[a]ny attempt to remove all judicial discretion in sentencing would raise serious concerns about the separation of powers." United States v. Manhai, 375 F.3d F.3d 1243, 1249-50 (11th Cir. 2004).

Although the federal sentencing guidelines are now only advisory, the guideline calculation is still the "starting point" for the ultimate sentence. Rita v. United States, 551 U.S. 338, 352 (2007). Both the Government and the defendant have a "a right to [the] correct calculation." United States v. Handy, 570 F.Supp.2d 437, 451 (E.D.N.Y. 2008). While the defendant's plea agreement leaves room for him to argue for a downward

adjustment of his guideline pursuant to the factors set forth in 18 U.S.C. Section 2553(e), is clear that the starting point has a significant impact on the ultimate sentence imposed.

The question that is presented for this Court's determination is by what mechanism should the adjusted guideline sentence be determined. The Government has used the full force of its prosecutorial power in this case in an effort to be the sole arbiter of that determination. Prior to the change of plea hearing in this case, the undersigned counsel met with the prosecutors and supervisors at the U.S. Attorney's Office and presented facts that the defense in good faith believed cast doubt on the motivational element of the terrorism enhancement. The defense suggested that given the importance of this issue that it be resolved by the Court – even on the basis of stipulated facts. The request was denied by the U.S. Attorney's Office. Rather than face the possibility of a life sentence if convicted at trial on the (now dismissed) assault counts, the defendant accepted the Government's narrow, one sided and incomplete version of events in this plea agreement as well as the application of the terrorism enhancement.

As the matter now stands, there will be no independent evaluation of the totality of relevant facts in this case by the sentencing tribunal.[3] The defense believes that this manner of proceeding is arbitrary – and unconstitutional – under the circumstances. Several reasons compel this conclusion. First, the terrorism enhancement in this case is qualitatively different from other sentence enhancers because it raises a question of intent and motive. Thus, for example, an enhancement for drug trafficking within a specified distance of a school is almost purely a factual question. The issue in this case necessarily

---

[3] A Presentence Report in this case was prepared for the Court's review. The document simply restates the Government's allegations against Oscar Ortega.

entails a different inquiry – "why" a person did a thing. That is a determination that seems particularly appropriate for determination by an independent judicial officer.

Second, the completely different result in the <u>Reel</u> case demonstrates the arbitrary nature of the Government's conduct with respect to defendant Oscar Ortega. Reel was prosecuted by the same U.S. Attorney's Office, in a case before the same federal district court judge. Reel posted a video claiming that the U.S. government was purchasing weapons and ammunition to be used against its own citizens and he offered a million dollar bounty for the murder of law enforcement agents. He came to Washington, D.C. with a car loaded with knives and ammunition and with planning and premeditation launched an attack against the While House complex. And yet, there is no mention in his plea agreement concerning the terrorism enhancement. While it is true that Oscar Ortega discharged a firearm in this case, he is being punished for that offense separately, with a crime that carries a ten year mandatory minimum sentence. With respect to the remaining offense conduct, however, there is no principled distinction between Joseph Reel's conduct and Oscar Ortega's, but the presumptive guideline results for each vary exponentially. This seems to be the very definition of arbitrary Government conduct.

Finally, the significant increase resulting from the imposition of the terrorism enhancement ought to be a basis for a more thorough than normal inquiry into its application. The greater the Government's ability to manipulate the sentencing calculation, the greater is the potential for abuse. In a recent decision, federal district court judge John Gleeson (a former federal prosecutor who convicted mafia cap John Gotti) decried the ability of prosecutors to threaten a defendant with a sentencing

enhancement for a prior drug conviction, in order to "coerce" a guilty plea. Judge

Gleeson noted that he used the term coerce in the following sense:

> the term "coerce" is not meant to suggest an overbearing of a defendant's free will, such that a resulting plea of guilty is involuntary in a legal sense. Rather, it is meant to suggest the use of prosecutorial power to invoke or threaten to invoke a mandatory sentencing provision that would result in a sentence that exceeds fair punishment for the case in order to procure a plea of guilty. The practice makes the risk of going to trial so great that rational defendants frequently have no choice but to voluntarily plead guilty.

United States v. Kupa, 2013 WL 5550419 at fn.9 (E.D.N.Y.). Judge Gleeson noted that

defendant Kupa had pled guilty shortly before trial only because he had been threatened

with the sentencing enhancement and that in essence, the prosecutors had deprived him of

his constitutionally guaranteed right to a trial. The judge ended his opinion with the

following ominous admonition: "If [the Department of Justice] cannot exercise its power

to invoke recidivist enhancements in drug trafficking cases less destructively and less

brutally, it doesn't deserve to have the power at all."

These comments apply with equal vigor to the circumstances present here.

Prosecutors have become used to the idea that they alone control the details of plea

agreements and can coerce sentencing concessions as they deem appropriate. The defense

in this case asks for nothing more than a fair opportunity to complete the factual

presentation before this Court. We are prepared to do this in any manner agreeable to the

court, but we think that due process demands no less.

**CONCLUSION**

For all of the foregoing reasons, the defense respectfully requests that this Court grant this request for relief.

Respectfully submitted,

*Robert Feitel*

_____

Robert Feitel
1712 N Street, N.W.
Washington, D.C.  20009
D.C. Bar 366673
202-450-6133 (office)
202-255-6637 (cellular)
RF@RFeitelLaw.com

On behalf of
Sandi S. Rhee, Esquire
Robert A. Spelke, Esquire

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing was sent, via the Electronic Filing System to all attorneys of record at the United States Attorney's Office for the District of Columbia, 555 4th Street, N.W., Washington, D.C., 20001, on this 17th day of February, 2014.

*Robert Feitel*

_____

Robert Feitel

.