UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 12-CR-00014 (RMC) |
| v. | : | |
| | : | |
| OSCAR R. ORTEGA-HERNANDEZ | : | Sentencing:  March 31, 2014 |
| Defendant. | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S NOTICE CONCERNING
APPLICATION OF TERRORISM ENHANCEMENT FOR SENTENCING

The United States of America by and through its attorney, the United States Attorney for

the District of Columbia, respectfully opposes the defendant Oscar Ramiro Ortega-Hernandez's

Notice Concerning the Application of Terrorism Enhancement for Sentencing (Document 59)

(hereinafter "Terrorism Enhancement Notice").  The United States submits that the Terrorism

Enhancement Notice is nothing more than a poorly veiled attempt to circumvent the terms of the

plea agreement, into which Oscar Ramiro Ortega-Hernandez ("Ortega-Hernandez" or "the

defendant") voluntarily entered, and which was accepted by this Court following a full and fair

colloquy.  The United States further submits that all of Ortega-Hernandez's arguments set forth

in the Terrorism Enhancement Notice are specious, and wholly without merit.  Accordingly, to

the extent that he is asking the Court to find that the terrorism adjustment set forth in United

States Sentencing Guidelines ("U.S.S.G.") § 3A1.4 does not apply to the facts of this case, the

Court should deny Ortega-Hernandez's requested relief.

FACTUAL AND PROCEDURAL BACKGROUND

A.  Ortega-Hernandez's Attack on the White House

On the night of November 11, 2011, Oscar Ramiro Ortega-Hernandez attempted to

assassinate the President of the United States by firing round after round from his semi-automatic

assault rifle at the White House. That attack was the culmination of several months during which the defendant fulminated against the President, whom he perceived to be the Anti-Christ, made threats against him, and prepared to take violent action against him. To accomplish his goal, Ortega-Hernandez traveled more than 2,000 miles by car from Idaho Falls, Idaho, to Washington, D.C., with his assault rifle and more than one hundred and eighty rounds of ammunition.

Following the attack on the White House, Ortega-Hernandez fled the area, and was arrested in Indiana, Pennsylvania, on November 16, 2011. The defendant first appeared in this district on November 21, 2011, before United States Magistrate Judge Alan Kay. On May 10, 2012, a Grand Jury returned a superseding indictment against Ortega-Hernandez, charging him with nineteen counts, including Attempt to Assassinate the President of the United States, in violation of Title 18, United States Code, Section 1751(c).

### B. Plea Discussions with Ortega-Hernandez

On August 31, 2012, the United States extended its first plea offer to the defendant in this case. In the offer, the defendant would plead guilty to Counts One (Attempted Assassination of the President of the United States) and Seven (Discharging a Firearm During a Crime of Violence), as well as agree that a terrorism adjustment would apply pursuant to U.S.S.G. § 3A1.4. Such a plea would subject the defendant to a mandatory minimum sentence of ten years imprisonment, and a guidelines range of life imprisonment. In return for the plea, the United States agreed to limit its allocution at sentencing to three hundred sixty (360) months imprisonment and dismiss the remaining seventeen counts against Ortega-Hernandez. In January 2013, Ortega-Hernandez rejected the plea offer.

As the case proceeded to trial in September 2013, Ortega-Hernandez approached the United States to request a new plea offer. Specifically, Ortega-Hernandez requested a plea offer which did not include Count One (Attempted Assassination of the President of the United States) nor a mandatory minimum sentence. On September 10, 2013, the United States extended a second plea offer to Ortega-Hernandez. Under the plea offer, the defendant would plead guilty to Count Five (Injury to a Dwelling and Placing Lives in Jeopardy) and Count Eleven (Discharging a Firearm During a Crime of Violence), as well as agree that a terrorism adjustment would apply pursuant to U.S.S.G. § 3A1.4. Such a plea would subject the defendant to a mandatory minimum sentence of ten years imprisonment and, with the adjustment, a guidelines range of 288-330 months (24-27.5 years) imprisonment. In return for the plea, the United States would dismiss the remaining seventeen counts against Ortega-Hernandez.

On September 11, 2013, in response to the plea offer, Ortega-Hernandez's attorneys proposed a counter-offer in which Ortega-Hernandez would plead guilty to Counts Five and Eleven but litigate the applicability of the terrorism adjustment. The United States rejected the counter-offer.

Following the United States' rejection of the counter-offer, Ortega-Hernandez's attorneys requested a meeting with the Chief of the Criminal Division of the United States Attorney's Office ("the Criminal Chief"). On September 12, 2013, the attorneys met with the Criminal Chief and again requested that the terrorism adjustment be dropped from the plea offer. The Criminal Chief heard the defense's arguments and once again rejected Ortega-Hernandez's counter offer because the terrorism adjustment clearly applies based on the facts of this case. The Criminal Chief indicated that if Ortega-Hernandez did not wish to accept the terms of the United States' plea offer, he could elect to proceed to trial.

### C. Ortega-Hernandez's Signed Plea Agreement and Statement of Facts

On September 16, 2013, Ortega-Hernandez signed the plea agreement. The plea agreement outlined the charges to which the defendant would be pleading guilty. Specifically, on page one of the agreement, the plea agreement stated that Ortega-Hernandez would plead guilty to Count Five (Injury to a Dwelling and Placing Lives in Jeopardy) as well as Count Eleven (Discharging a Firearm During a Crime of Violence). On page two of the agreement, it stated that Count Five carried a maximum penalty of twenty years imprisonment and Count Eleven carried a mandatory minimum sentence of ten years imprisonment, which must be consecutive to any other sentence the Court imposed.

Section IV of the plea agreement was entitled "Sentencing Guidelines Analysis." In the introductory paragraph of Section IV, it stated that "[p]ursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the parties agree to the following." Ltr. from the United States to R. Spelke et al., at 3 (Sep. 10, 2013). Under subsection A of Section IV, it stated as follows:

**The parties agree that the following Sentencing Guidelines sections apply to Count Five of the Superseding Indictment:**

| | | |
|---|---|---|
| 2B1.1(a)(2) | Base Offense Level | 7 |
| 2B1.1(b)(1)(F) | Loss greater than $70,000 | +8 |
| 2B1.1(b)(14) | Conduct involved risk of injury/use of firearm | +2 |
| | Pre-Adjustment Total | 17 |
| **3A1.4(a)  Terrorism Adjustment** | **(+12 levels or minimum level 32)** | **+15** |
| | Total Adjusted Offense Level | 32 |

Id. (emphasis added). The calculated Estimated Sentencing Guidelines Range stated in the plea agreement was "288 to 330 months" imprisonment. In addition, it was stated in the plea agreement that:

> The parties agree that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment to the Estimated Guidelines Range, nor will either party suggest that the Court consider such a departure or adjustment, except as provided infra.

Id. at 4. The last page of the plea agreement outlined the defendant's acceptance of the plea agreement which stated:

> I have read this Plea Agreement and have discussed it with my attorneys. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offenses identified in this Agreement.
>
> I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Plea Agreement. I am satisfied with the legal services provided by my attorneys in connection with this Plea Agreement and matters related to it.

Id. at 11. Following the above two paragraphs, Ortega-Hernandez signed and dated the plea agreement. Below Ortega-Hernandez's signature was the Attorney's Acknowledgment section, which stated:

> I have read each of the pages constituting this Plea Agreement, reviewed them with my client, OSCAR RAMIRO ORTEGA-HERNANDEZ, and fully discussed the provisions of the Agreement with my client. These pages accurately and completely set forth the entire Plea Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Id. Following the above paragraph, Ortega-Hernandez's attorney, Robert Spelke Esq., signed and dated the plea agreement.

Accompanying the plea agreement was a ten-page document entitled "Statement of Facts in Support of Guilty Plea" (hereinafter "Statement of Facts"). The Statement of Facts included the relevant facts outlining the crimes for which Ortega-Hernandez pled guilty as well as the relevant facts detailing Ortega-Hernandez's motive underlying those crimes. With respect to his motive, the Statement of Facts detailed Ortega-Hernandez's contempt for the federal government and his numerous anti-government statements. In addition, the Statement of Facts included the video message Ortega-Hernandez recorded shortly before leaving Idaho to travel to Washington, D.C. to commit his criminal actions. The video message included Ortega-Hernandez praising Osama bin Laden for having the courage to stand up to the United States, and calling for a revolution against the federal government. Specifically, Ortega-Hernandez stated that bin Laden "is the only one that had the balls to stand up and say our people have had enough of all these years of bullying and killings and unfairness with the oil. I think Osama's the only one brave enough to stand up to the strongest, most powerful country in the world." In the second video message, Ortega-Hernandez described himself as a "cold-hearted warrior of God" and called for a revolution against the federal government. Specifically, Ortega-Hernandez stated, "You see everybody, it's time for Armageddon. It's time for a revolution. It's time to take stand and stop letting this corrupt government rule us with an iron fist." These relevant facts prove that Ortega-Hernandez's crime for which he pled guilty was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), and therefore qualifies as a federal crime of terrorism.

The last page of the Statement of Facts outlined the defendant's acceptance of all of the facts contained therein:

> I have read this Statement of Facts in Support of Guilty Plea and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of Facts and all matters relating to it. I fully understand this Statement of Facts and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of Facts fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth in the Plea Agreement.

Statement of Facts at 10. Following the above two paragraphs, Ortega-Hernandez signed and dated the plea agreement. Below Ortega-Hernandez's signature was the Attorney's Acknowledgment section, which stated:

> I am the attorney for OSCAR RAMIRO ORTEGA-HERNANDEZ. I have reviewed every part of this Statement of Facts in Support of Guilty Plea with him. It accurately and completely sets forth the Statement of Facts agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

Id. Following the above paragraph, Ortega-Hernandez's attorney, Robert Spelke Esq., signed and dated the plea agreement.

### D. Ortega-Hernandez's Plea Hearing

On September 18, 2013, Ortega-Hernandez entered a plea of guilty before this Court to Counts Five and Eleven of the Indictment. During the plea hearing, the Court went over the terms of the plea agreement with Ortega-Hernandez including the Estimated Sentencing Guidelines Range that included the twelve-level terrorism adjustment. The Court also explained to Ortega-Hernandez the various rights he was forgoing by pleading guilty, including his constitutional right to a trial. Ortega-Hernandez acknowledged the waiver of his rights, and indicated his intent to plead guilty. Furthermore, the Court explained to Ortega-Hernandez the Statement of Facts and inquired as to whether he agreed with all of the statements contained

therein. Once again, Ortega-Hernandez stated that he did. Following the colloquy, the Court accepted Ortega-Hernandez's representations and found that he had knowingly and voluntarily entered his guilty plea.

### E.  Ortega-Hernandez's Pre-Sentence Investigation Report

On December 4, 2013, Kathie J. McGill of the United States Probation Office prepared a Pre-Sentence Investigation Report (hereinafter "PSR") and submitted it to the parties in this case. The PSR outlined all the relevant details of Ortega-Hernandez's case, including among other things, biographical information of the defendant, the indictment, the facts underlying the plea, and the Sentencing Guidelines calculation. In addition, the PSR included a written statement of Ortega-Hernandez, in which he stated, "I accept full responsibility for my actions and adopt and agree with everything contained in the Statement of Facts that I signed and has been filed in my case." PSR at 13. In calculating the defendant's sentencing guidelines, the PSR included a terrorism adjustment because "[t]he offense is a felony that involved, or was intended to promote, a federal crime of terrorism; therefore, 12 levels are added." PSR at 13. Accordingly, the PSR calculated the applicable sentencing guidelines range for Ortega-Hernandez of 288-330 months (24-27.5 years) imprisonment, the same range agreed to by the parties in the plea agreement. PSR at 26.

On February 3, 2014, Ortega-Hernandez submitted his objections and corrections to the PSR. Ortega-Hernandez did not object to the terrorism adjustment nor the sentencing guidelines calculation in the PSR.

### F. Ortega-Hernandez's Terrorism Enhancement Notice

In his Terrorism Enhancement Notice,[1] Ortega-Hernandez is challenging the applicability of the terrorism adjustment to this case, despite the fact that: the adjustment was an explicit condition of the plea agreement to which the defendant and the United States agreed; the terrorism adjustment and its implications were discussed at the defendant's sentencing hearing; the United States Probation Office concluded, without objection by the defense, that the terrorism adjustment applies to Ortega-Hernandez's case; and the applicability of the terrorism adjustment is factually and legally supported by the undisputed facts of this case. As grounds for his notice, the defendant claims (i) that the United States "coerced" Ortega-Hernandez into accepting a plea with the terrorism adjustment, and (ii) that "this coerced acceptance of the [adjustment] and the intentionally disparate treatment of similarly situated defendants is arbitrary on its face and violates defendant Oscar Ortega's due process rights." Terrorism Enhancement Notice at 2.

The United States respectfully submits that Ortega-Hernandez's Terrorism Enhancement Notice fails on both fronts. First, a defendant does not have a constitutional right to the plea offer of his or her own choosing. If Ortega-Hernandez was unhappy with the terms of the plea offer extended by the United States, he should have elected to go to trial in this matter. Second, Ortega-Hernandez has not been treated differently than similarly situated defendants. The case cited by the defendant as proof of this disparate treatment did not involve a federal crime of

---

[1] Ortega-Hernandez entitled his docket entry as a Notice Concerning Application of Terrorism Enhancement for Sentencing. The filing itself is entitled "Defendant's Memorandum Concerning the Unconstitutional Application of the Terrorism Enhancement." It is clear from the substance of Ortega-Hernandez's filing that it is most accurately characterized as an attempt to circumvent his agreement not to object to the applicability of the terrorism adjustment to this case. Although the government would no doubt have a basis to declare Ortega-Hernandez in breach of the plea agreement, the government does not intend to invoke the provisions of the plea agreement concerning a breach. Rather, as argued below, the government asks the Court to adopt the well-supported recommendation of the PSR, to which neither party objected, and find that the terrorism adjustment is applicable to the undisputed facts of this case.

terrorism, and therefore a terrorism adjustment was inapplicable at sentencing in that case. Accordingly, because his arguments on both grounds are unfounded and wholly without merit, and because there is more than an ample factual basis to apply the terrorism adjustment, this Court should find that the adjustment applies.

## ARGUMENT

1.  A defendant does not have a constitutional right to the plea offer of his own choosing.

It is well settled that the Due Process Clause is not violated by prosecutors who "openly present[] the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution." Bordernkircher v. Hayes, 434 U.S. 357, 365 (1978). The United States Supreme Court has explained that there is no violation of a defendant's constitutional rights "so long as the accused is free to accept or reject the prosecution's offer." Id. at 363; see also Corbitt v. New Jersey, 439 U.S. 212, 225 (1978) (holding that "the State did not trespass on the defendant's rights so long as the accused was free to accept or reject the choice presented to him by the State"); United States v. Thomas, 114 F.3d 228, 272 (D.C. Cir. 1997) ("So long as the defendant is free to accept or reject the prosecution's offer, the choice is simply the inevitable consequence of plea bargaining, which the Court has accepted as a legitimate process."). "Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to self-condemnation." Bordernkircher, at 363; see also Corbitt, 439 U.S. at 225 ("There is no suggestion here that [the defendant] was not well counseled or that he misunderstood the choices that were placed before him.").

Applying these well-settled principles to the instant case, the United States respectfully submits that there is absolutely no evidence that Ortega-Hernandez was "coerced" into accepting

a plea agreement with the terrorism adjustment. Instead, a plea agreement with the terrorism adjustment was the only plea offer put forth by the United States. Ortega-Hernandez could have accepted or rejected it. Ortega-Hernandez's constitutional rights are not violated simply because he would prefer a plea offer without the terrorism adjustment. Ortega-Hernandez repeatedly requested the United States to modify the plea offer, but those requests were denied, including by the Criminal Chief. Accordingly, Ortega-Hernandez was left with the "unpleasant alternative" of accepting the plea offer with the terrorism adjustment or going to trial. He chose to plead guilty. During the entire plea discussion process he was ably represented by competent counsel. He, and his attorney, signed the plea agreement which explicitly stated that the terrorism adjustment would apply. He, and his attorney, signed the Statement of Facts which outlined the motivation for the crime to which he was pleading guilty. Ortega-Hernandez had the benefit of a full and fair colloquy before this Court at which the terrorism adjustment was explained to him. After all of these procedural protections, Ortega-Hernandez entered a knowing and voluntary plea of guilty.

In his Terrorism Enhancement Notice, Ortega-Hernandez is not asking to withdraw from that plea, but instead he simply wants a different plea agreement.[2] The defendant does not cite a single case in support of the proposition that the Constitution mandates a court to alter a plea agreement already entered into by the parties and accepted by the court when the defendant would prefer an alternative plea offer. The United States respectfully submits that Ortega-Hernandez's argument that his plea was coerced is completely unfounded.

---

[2] In his Terrorism Enhancement Notice, the defendant writes "[r]ather than face the possibility of a life sentence if convicted at trial on the (now dismissed) assault counts, the defendant accepted the Government's narrow, one sided and incomplete version of events in this plea agreement as well as the application of the terrorism enhancement." Terrorism Enhancement Notice at 11. The statement could be read as suggesting that Ortega-Hernandez's plea was not knowing and voluntary, or that he is moving to withdraw his plea. The United States would suggest the Court conduct a further inquiry of the defendant on this point.

2.   Ortega-Hernandez's has not been treated differently than similarly situated defendants.

Ortega-Hernandez's second argument in his Terrorism Enhancement Notice is that his constitutional rights have been violated because a terrorism adjustment was not applied to the defendant in the case of United States v. Joseph Reel, 13-CR-00196.[3]  In the Reel case, the defendant pled guilty to one count of Assaulting an Officer or Employee of the United States, in violation of Title 18, United States Code, Section 111.  Ortega-Hernandez states correctly "[t]he plea agreement makes absolutely no mention of the terrorism enhancement."  Terrorism Enhancement Notice at 7.  Ortega-Hernandez fails to recognize however that Assaulting an Officer or Employee of the United State is not a federal crime of terrorism as defined by Title 18, United States Code, Section 2332b(g)(5).  Therefore, the terrorism adjustment in U.S.S.G. § 3A1.4 cannot apply to the offense of conviction in the Reel case, regardless of the defendant's motivation.  By contrast, Count Five, Injury to a Dwelling and Placing Lives in Jeopardy, to which Ortega-Hernandez pled guilty, is a federal crime of terrorism.  Accordingly, the terrorism adjustment in U.S.S.G. § 3A1.4 is applicable to Ortega-Hernandez's offense.

Furthermore, the facts in the Reel case are substantially different than those in the Ortega-Hernandez case.  The defendant in Reel traveled from Ohio to Washington, D.C. in June 2013 "for the purpose of spray painting the 'Don't Tread on Me Snake' on the White House Residence."  Statement of Offense (Document 13), United States v. Reel, at 2 (Oct. 4, 2013).  On June 9, 2013, at 3:00 AM, the defendant called 911 to report a threat against the President of the United States.  Shortly thereafter, the defendant caused his unmanned vehicle to travel in the direction of a United States Secret Service ("USSS") guard booth located on Pennsylvania

---

[3]  In his Terrorism Enhancement Notice, Ortega-Hernandez incorrectly states that the Reel case was before this Court.  See Terrorism Enhancement Notice at 7 (noting the plea "was presented and accepted by this Honorable Judge"); at 12 (describing the case as "before the same federal district court judge").  In fact, the Reel case was before the Honorable Rudolph Contreras.

Avenue in front of the White House. Id. at 4. The vehicle hit a light post, a steel bollard, and one of the steel bike racks causing $5,345 worth of damage. Id. Following the vehicle's crash, the defendant jumped the fence and entered the North Courtyard of the Eisenhower Executive Office Building, where he was apprehended by USSS officers. Located near the defendant at the time he was apprehended was a spray paint can. No firearms were found on the defendant or in his vehicle.

By contrast, Ortega-Hernandez began making anti-government statements and threats against the President in mid-2010. Ortega-Hernandez's friends in Idaho have stated that he called the President the "Antichrist" and the "devil." Ortega-Hernandez stated that "something needs to be done about [the President] or else we're fucked." Numerous friends reported that Ortega-Hernandez declared that "President Obama needed to be taken care of" and he "was the one to do it." On March 19, 2011, eight months prior to the attack, Ortega-Hernandez purchased a Romanian Cugir SA semi-automatic (AK-47 style) assault rifle for $550. Ortega-Hernandez also purchased more than 1,200 rounds of ammunition to use with the weapon. Over the course of the next six months, Ortega-Hernandez practiced firing the assault rifle at a desolate crater located on land owned by the Bureau of Land Management outside of Idaho Falls, Idaho.

On October 23, 2011, Ortega-Hernandez packed his 1998 black Honda Accord with some personal possessions and left Idaho Falls, driving east. Ortega-Hernandez brought with him his Romanian Cugir SA semi-automatic assault rifle with him, as well as over one hundred and eighty rounds of ammunition.

On November 11, 2011, which is Veterans' Day, shortly before 9:00 PM, Ortega-Hernandez was driving his car westbound on Constitution Avenue when he stopped directly across the Ellipse from the South Lawn of the White House. With the passenger-side window of

his car lowered, he pointed his semi-automatic assault rifle out the window of the car and aimed directly at the White House.  The defendant opened fire on a residential section of the White House, firing eight to ten rounds directly at the occupied building.

Following the shooting on November 11, 2011, the FBI searched the area around the White House and located more than five confirmed bullet impact points on the south side of the building on or above the second story.  That area of the White House is widely known to be the residence of the First Family.  Two bullets were also recovered from the White House: one from a window frame on the Truman Balcony and one found on the ground east of the entrance.  The FBI concluded that both of those bullets were fired by Ortega-Hernandez's weapon.  The FBI also recovered a bullet jacket that was found in the window sill of the Truman Balcony, which it has also concluded was fired from Ortega-Hernandez's weapon.[4]  A third bullet was discovered on the roof of St. John's Episcopal Church, located across Lafayette Square from the White House.  Total damage done to the White House as a result of Ortega-Hernandez's attack was approximately $97,757.93.  Ortega-Hernandez's criminal actions put the lives of the First Family, the United States Secret Service officers who were located in and around the White House, tourists located in the area, and individuals in Lafayette Square in jeopardy.

Following the shooting, Ortega-Hernandez fled the scene in his car, driving erratically and at a high rate of speed.  Moments later, Ortega-Hernandez crashed his vehicle near the ramp from Constitution Avenue to the Theodore Roosevelt Bridge in front of the U.S. Institute of Peace.  After efforts to restart the vehicle failed, Ortega-Hernandez quickly ran from the car on foot, leaving behind many possessions, including the Romanian Cugir SA assault rifle with an

---

[4] Several fragments were also collected in that area but could not be identified or eliminated as having been fired from that rifle.

Page 14

attached loaded magazine, three additional fully loaded magazines, and five additional boxes of ammunition. Soon after law enforcement identified the defendant as one of the owners of the vehicle, he became the subject of a multi-agency manhunt that crossed several jurisdictions. Five days later, on November 16, 2011, Ortega-Hernandez was arrested by Pennsylvania State Police troopers at a hotel in Indiana, Pennsylvania.

The United States respectfully submits that the defendant in the Reel case, armed with a spray paint can and intending to vandalize the White House, is not remotely similar to Ortega-Hernandez and the instant case, which involves the attempted assassination of the President of the United States.[5] Because Ortega-Hernandez has not been treated differently than a similarly situated defendant, his constitutional rights have not been violated. Moreover, as the above recitation of facts clearly demonstrates, the applicability of the terrorism adjustment is fully warranted in this case.[6]

_____

[5] The United States would respectfully submit that the most similarly situated defendant to Ortega-Hernandez is the defendant in United States v. Duran, 96 F.3d 1495 (D.C. Cir. 1996). Though the Duran case preceded the terrorism adjustment provision of the U.S.S.G., the defendant in Duran was sentenced to forty years imprisonment following trial.

[6] Courts have applied the terrorism adjustment in numerous other cases, including less violent ones, where the facts met the requirements of the adjustment under the sentencing guidelines. See e.g., United States v. Ressam, 679 F.3d 1069, 1090 (9th Cir. 2012) (en banc) (holding the district court's sentence below the terrorism-adjusted guidelines range was substantively unreasonable for a defendant who was stopped at U.S.-Canadian border and discovered to be plotting to blow up Los Angeles International Airport); United States v. Chandia, 675 F.3d 329, 340 (4th Cir. 2012) (upholding district court's application of terrorism adjustment to a defendant who provided material support to Pakistani terrorist group leader); United States v. Christianson, 586 F.3d 532, 539 (7th Cir. 2009) (upholding application of terrorism adjustment to an eco-terrorist defendant who destroyed over 500 trees used in scientific experimentation); United States v. Mandhai, 375 U.S. F.3d 1243, 1248 (11th Cir. 2004) (upholding application of terrorism adjustment to a defendant whose "goal was to bomb and disable public utilities" even though he "lacked both the means and ability to carry out his defined activity"); United States v. Graham, 275 F.3d 490, 516-518 (6th Cir. 2001) (upholding district court's application of terrorism adjustment to a local militia member who was plotting to attack government targets at some future date); United States v. Nafis, No. 12-720 (E.D.N.Y. 2013) (applying terrorism adjustment to a defendant who attempted to blow up the Federal Reserve building in New York with a fake bomb provided by an undercover FBI agent); United States v. Harpham, 2011WL6838070 (Dec. 27, 2011) (applying terrorism adjustment to case involving thwarted attempt to place explosive device along Martin Luther King, Jr. parade route); United States v. Benkahla, 501 F. Supp.2d 748, 757 (E.D. Va. 2007) (applying terrorism adjustment to defendant who lied in the grand jury in an investigation involving a federal crime of terrorism); United States v. Garey, 383 F. Supp.2d 1374, 1378 (M.D. Ga. 2005) (applying terrorism adjustment to defendant who made telephone threats to blow up Macon City Hall, a Macon shopping mall, and a Macon news organization);

## CONCLUSION

WHEREFORE, for the reasons stated above, the United States requests that, contrary to the suggestion of Ortega-Hernandez's Terrorism Enhancement Notice, the Court find that the terrorism adjustment under U.S.S.G. § 3A1.4 applies to the undisputed facts of this case.

Respectfully Submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
DC Bar No. 447889

By:

GEORGE P. VARGHESE
Special Assistant United States Attorney
ALESSIO EVANGELISTA
Assistant United States Attorney
DC Bar No. 456715
555 Fourth Street, N.W.
Washington, DC 20530
(617) 748-3237 (Varghese)
(202) 252-7247 (Evangelista)