UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                        :                12 Cr. 14  (Collyer, RM)

v.                                   :

OSCAR R. ORTEGA-HERNANDEZ            :

Defendant.

DEFENDANT OSCAR ORTEGA'S
MEMORANDUM IN AID OF SENTENCING

**INTRODUCTION**

Defendant Oscar Ortega-Hernandez is currently pending sentencing before this Court

after having pled guilty to one count of destruction of property in violation of 18 U.S.C. § 1363

and one count of Discharging a Firearm in violation of 18 U.S.C. § 924(c)(1)(A).  As the Court

knows, the defendant was originally charged with the Attempted Assassination of the President

of the United States and other armed assault counts against uniformed members of the Secret

Service. The Plea Agreement finally entered into between the parties, however, did not require

Oscar to plead guilty to these charges for one simple reason: he was not guilty of the offenses.[1]

Notwithstanding, the Government seeks to punish him as though he were; the prosecutors want

to send this twenty-three year old defendant to jail for twenty years or more.

Without minimizing Oscar's conduct, it is clear now – more than two years after the

events of November 11, 2012 – that he was a confused and in many ways, a desperate young

man. Filed under seal along with this Sentencing Memorandum is a forensic report prepared by

Doctor Robert Madsen, who administered a series of psychological tests to Oscar. Based upon

---

[1] Department of Justice regulations require prosecutors to seek a guilty plea to the most serious count charged in an indictment. See U.S. Attorney's Office Manual 9-27.400 ("the prosecutor should seek a plea to the most serious readily provable offense charged"). It is inconceivable that the prosecutors in this case did not demand a plea agreement for the assassination charge or the assault counts if they could have been readily proven.

the results of the testing protocols and his interview and analysis of Oscar's personal history, Dr. Madsen concluded that Oscar has obtained significant insight into the forces that drove him to commit these offenses, that he now wishes more for his life, and that under appropriate circumstances, "he can be changed for the better." This Court can likewise conclude that Oscar does not pose a future risk of violent conduct. Under the terms of the Plea Agreement in this case Oscar must serve a mandatory minimum sentence of ten years. He is only twenty-four years old now and for him, even the mandatory minimum will seem like a lifetime.

It is an understatement to say that Oscar Ortega is sorry for what happened and that he desperately wishes he could take back his conduct. Worse, he now understands that his mental processes were impaired and that he acted in a way that had the potential to cause significant harm. Fortunately, all that was damaged in this case was the façade of the White House.

The defendant has been continuously incarcerated since his arrest on November 16, 2011. Based upon the inclusion of the terrorism enhancement, the Presentence Report calculated Oscar's offense level for the destruction of property charge at 30 with a Criminal History Category of IV, resulting in a sentencing guideline range of 168-210 months.  In addition, there is a mandatory-minimum under 18 U.S.C. § 924(c)(1)(A) that requires a ten year term be consecutive to any other period of incarceration imposed by the Court.  In prior pleadings, the defense has objected to the manner in which the enhancement was applied in this case. Even assuming *arguendo* the enhancement applies, this Court has the power to ameliorate its unfair and draconian consequences in this case.

For all of the reasons set forth in this memorandum, particularly the expert conclusions reached by Dr. Madsen, the defense requests this Court exercise its discretion pursuant to the factors set forth in 18 U.S. Code Section 3553 and sentence the defendant to a term of ten years

incarceration, followed by the maximum period of supervised release. This Court is tasked with the duty to impose a sentence "sufficient, but no greater than necessary" to punish and deter. Kimbrough v. United States, 552 U.S. 85 (2007). The measure of justice in any particular case is not determined solely by the length of a prison sentence.  Given Oscar's extreme youth and his improved insight into his own actions, a decade of incarceration is more than sufficient to satisfy the interests of justice in this case.

## FEDERAL SENTENCING FRAMEWORK

Since the Supreme Court's decision in United States v. Booker, 542 U.S. 220 (2005), a court must impose a sentence which is sufficient, but no greater than necessary, to effectuate the statutory requirements set forth in 18 U.S.C. Section 3553(a).  A sentencing court must consider both the "Guideline ranges" and also "tailor the sentence in light of the other statutory concerns as well."  Booker, 542 U.S. at 245-46.  As the Second Circuit has noted, since *Booker* ended the mandatory aspect of the sentencing guidelines, "the duty imposed by Section 3553(a) acquires renewed significance."  United States v. Crosby, 397 F.3d 103, 111 (2d. Cir.).

These statutory factors include:  (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentencing to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (3) specific and general deterrence; (4) the need to provide the defendant with training, medical care, or treatment; available sentencing alternatives; (5) consistency in sentencing among similarly-situated defendants; and (6) the need to provide restitution. 18 U.S.C. §3553(a).

Although the starting point for the calculation of a defendant's sentence is with the application of the relevant federal sentencing guideline calculations, it is also now clear that the sentencing court has discretion to impose a sentence outside of the range when it is justified by

the 3553(a) factors.  Thus, in <u>Gall v. United States</u>, 552 U.S. 38, 47 (2007), the Supreme Court

rejected the suggestion that it takes "extraordinary circumstances" to sentence a defendant

outside of the guideline range or the use of a "rigid mechanical formula" based upon the

percentage of departure from the guidelines as a test of the reasonableness of a sentence.  Indeed,

the sentencing judge may take into consideration that the Guidelines sentence should not apply

"because the guidelines sentence itself fails properly to reflect § 3553(a) considerations . . ." <u>Rita</u>

<u>v. United States</u>, 551 U.S. 338, 351 rehearing denied 551 U.S. 1181 (2007).

     Similarly, in <u>Kimbrough v. United States</u>, 552 U.S. 85, 109 (2007), the Supreme Court

noted that the sentencing judge has greater familiarity with any particular defendant and any

particular case than the generic guidelines and that the decision to "vary" from the advisory

guidelines was entitled to the greatest respect when the court finds that a particular case is

"outside the heartland" for which the federal sentencing commission intended the guidelines to

apply.  Of course, this court is directed by statute to impose a sentence which is "sufficient, but

not greater than necessary" to accomplish the factors identified in 18 U.S.C. § 3553(a).

**<u>The Guideline Calculation</u>**

     In this case, the Presentence Report computed the guideline sentence for Counts 5 and 11

as follows:

<u>COUNT FIVE</u>

| | |
|---|---|
| Base Offense Level - 18 U.S.C. Section 1363 | 7 |
| Loss Amount  (over $70,000.00) | +8 |
| Risk of Injury/Use of Firearm | +2 |
| Acceptance of Responsibility | -2 |
| | _____ |
| Pre-adjustment Total | 15 (18-24 months) |

During the preparation of this sentencing memorandum, the defense realized that this Guideline calculation improperly "double counts" by including a two point upward adjustment for the use of a firearm in the commission of the offense because the defendant also pled guilty to a violation of 18 United States Code 924(c). The Sentencing Guidelines commentary with respect to 924(c) is clear with respect to this point:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, **do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense.** A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct of which the defendant is accountable under §1B1.3 (Relevant Conduct).

U.S.S.G. 2K2.4 Note 4. (emphasis added). <u>Accord</u> <u>United States v. Townsend</u>, 178 F.3d 558, 562 (D.C. Cir. 1999). Thus, the defendant's actual adjusted guideline calculation for the destruction of property offense should be Level 13, which has a corresponding penalty of 12-18 months.

The next step in the calculation of the guideline for the destruction of property charge is the application of the terrorism enhancement. The defense has previously objected to the manner in which the enhancement was applied in this case, but assuming *arguendo* that it applies, the calculation is as follows:

*Terrorism Enhancement*                              +12 or minimum level 32 and criminal
                                                     History VI


**Adjusted Guideline**                               **168 - 210 months**

<u>COUNT ELEVEN</u>

Mandatory Consecutive Ten Year Sentence             120 months


**TOTAL POTENTIAL GUIDELINE SENTENCE**              **288 - 330 months**

The question presented to this Court is how much time should Oscar Ortega spend in jail. Absent the terrorism enhancement, his guideline range for the destruction of property count would be level 13, which corresponds to a sentence of 18 – 24 months, plus the mandatory, consecutive ten year firearm sentence. Any analysis of the sentencing factors supports the defendant's requested sentence of ten years.

## APPLICATION OF THE SENTENCING GUIDELINE FACTORS

<u>Personal Information</u>

Oscar Ortega-Hernandez is a 23 year old young man who was born in Seattle, Washington.  Due to family problems, he had a nomadic childhood. His family moved to Butte, Montana when he was four years old and three years later the family relocated to Twin Falls, Idaho, where Oscar's parents separated. Oscar and his sister continued to live with their mother, who had another child out of wedlock. Over the course of the next four years, the family moved to a suburb of Bozeman, Montana and then at age eleven, Oscar was sent back to Twin Falls, Idaho to live with his father. Because of behavior issues, Oscar was ordered by his father to live in Mexico with relatives when he was fifteen and he remained outside the United States for a year. His time in Mexico was almost completely unproductive. He was not enrolled in school, spoke only rudimentary Spanish and had no friends or work. Oscar finally returned to live in Idaho Falls in 2007, where he remained until his arrest in this case. Oscar's parents formally divorced when he was nineteen.

As explained more fully in Dr. Madsen's report, the lack of emotional support and parental guidance during Oscar's formidable years helped create circumstances that fueled his subsequent criminal behavior.  Oscar parents managed a local restaurant, and unfortunately had very little time to care for their children and help with their upbringing.  As the result of marital

strife, his parents' relationship was never close. Indeed, Oscar's older sister Yessica Ortega explained they were basically on their own during childhood. She was Oscar's primary caretaker and the only stable relationship in Oscar's life.

Not surprisingly, by middle school, Oscar lost interest in education and spent his free time with a group of underage friends that smoked marijuana and drank alcohol. A very close friend stole money from his family, causing Oscar further problems with trust. In an immature effort to achieve intimacy, he met Jessica Galbraith and became immediately and hopelessly attached to her. The teenage relationship produced a child named Israel, but because of their youth and Oscar's personal intimacy issues, the two separated.

During his meetings with Dr. Madsen, Oscar admitted that he was frequently depressed and seriously entertained committing suicide on at least two occasions while still in his teens. He was undereducated, lonely and vulnerable and it was only his determination not to cause his family the trauma of his suicide that caused him not to give in to these urges. [2]

Ultimately, Oscar's exposure to the survivalist subculture led to his criminal involvement in this case. Oscar travelled to a local university sometime in early 2011, where he met and developed a friendship with a person who will be identified in this memorandum as "JC." As a result of this relationship, Oscar was introduced to the Mayan calendar prediction that the world would end in 2012. Oscar was particularly susceptible to this propaganda because his own family had been frantic during the fear and hysteria surrounding the end of the millennium (the "Y2K" fear). In addition, Oscar's new survivalist friend preached that there would be chaos from solar flares destroying civilization and there would be resulting anarchy in the streets. To

---

[2] Oscar was also arrested for stealing beer from a Walmart in 2008 and received a sentence of five days in jail. In 2009, Oscar's experimentation with psychedelic mushrooms, led him to an arrest for Resisting Arrest and Possession of Drug Paraphernalia. He was placed on probation for two years. During the course of the event, Oscar's friends had to stop him from jumping off a balcony, while yelling "this is the end."

reinforce these claims, Oscar viewed apocalyptic videos and other material on the internet. Oscar became frantic that in the ensuing dark times his family would be unable to protect themselves from rampaging hordes. As a result, although he never before possessed a gun, on March 19, 2011, Oscar purchased a rifle from JC to protect himself and his family. Depressed, frightened, and vulnerable, Oscar became obsessed with supernatural predictions and current events.

For the first time in his life, he intensively watched news reports and became convinced that the United States was going to wage another war in Iraqi to secure access to oil. Oscar also became obsessed with the idea that the United States would be attacked by nuclear weapons because of its position in world politics. In order to prepare for the coming dark times, Oscar began exercising regularly and started training in Mixed Martial Arts so as to be able to protect himself and his family members. Oscar was frantic over the thought of losing his only son and his nieces and nephews in the coming holocaust. His belief in the ensuing end of the world frightened Oscar to the very core of his being.

His fears then turned to thoughts of finding a way to inform the public of the coming Armageddon and moreover, on a method to stop it. Oscar wanted to let the world know the evils that oil consumption had on world politics and the adverse consequences to the United States. In his naivete, he created the "idea" to have people ride their bicycles more frequently in order to reduce our dependence on oil, which would also alleviate the growing problem with obesity in the United States. Oscar made a forty-five minute videotape of his concerns and tried to borrow $200,000.00 from a bank to air his message on public television. Failing to secure the loan, Oscar edited the tape for submission to a contest sponsored by Oprah Winfrey for creative solutions to societal problems. Oscar believed that airing his tape on national television would

stop the apocalypse he was convinced was coming.  Unfortunately, the edited tape was never sent to Ms. Winfrey and the deadline for submissions passed.

Oscar was now even more desperate to do something – anything - to bring attention to what he believed was the inevitable Armageddon.  Failing to alert the public through his informative tapes, Oscar chose a different approach, but for the same reasons – to alert the public of the coming chaos in an effort to prevent it.  Oscar had the rifle and thought about shooting at various locales to obtain attention through news media.  He concluded that nothing in Idaho Falls was important enough to muster the attention he needed.  Oscar also ruled out the Grand Canyon as too remote and the Statue of Liberty because it was located on an island and would attract little attention.

In a decision that he will have many years to consider and regret, Oscar then realized that the White House in Washington, D.C. would make a perfect location to call attention to the pending disaster. Oscar chose the White House for several reasons. First, he did not want to hurt anyone and he believed the White House was an impenetrable fortress.  Moreover, it was a significant enough location to get the attention he so desperately desired.   On November 11, 2011, his thoughts turned to action and he committed the instant offense.

The Instant Offense

Oscar Ortega-Hernandez pled guilty to one count of Injury to a Dwelling and one count of Using, Carrying, Brandishing and Discharging a Firearm. The facts of this offense are well known to the Court and a detailed statement is contained in the Presentence Investigation Report. In summary, Oscar fired several rounds from a rifle towards the White House from a distance of more than seven football fields away. The scope on the weapon was later determined to be virtually useless. After firing the shots, Oscar sped away in a panic, crashed his car, and then

abandoned the vehicle and the weapon, leaving behind all his belongings and providing sufficient information for law enforcement to immediately identify him. It is a sad commentary to note that when Oscar first arrived in Washington, D.C., he was under the singular misimpression that the U.S. Capitol building was in fact the White House.

At this stage of the proceedings, the defendant wants the Court to understand that at the time of the offense, he was suffering from extreme depression and mental duress. Oscar now appreciates that what he did was wrong, violated the law, and posed a grave threat to public safety. His intention, however, was a misguided effort to make the public aware of what he believed to be the coming Armageddon. It was emphatically not his intention to injure anyone, let alone President Obama. Indeed, the President was not even at the White House when the shots were fired.  No one was injured in the events of November 11, 2012 and Oscar did not plead guilty to any assaultive conduct. In sum, this was not a preplanned act of terrorism, but the desperate actions of a depressed young man looking for attention to his cause of saving the world from itself.

As Dr. Madsen explains in his Report, Oscar acted out in a state of depression and desperation over his perceived need to protect his family and the world against coming Armageddon.  There is no question that at some level, Oscar knew that what he was doing was wrong, but he was laboring under an enormous amount of mental stress and was unable to control himself. The cumulative effect of the rejection of his family, close friends, and mother of his then two year old child moved Oscar to a deep depression.  His childhood lacked the parental love and support to prepare him for such rejection and the disappointment he suffered at the hands of those closest to him.  Once Oscar fell into the "end of world" propaganda, the ideas and notions affected his mental state resulting in his desperate act for attention to his cause.

As set forth in Dr. Masen's Report, however, Oscar now understands that the act of firing

at the White House simply does not make any sense. He admits his wrongdoing, but looking

back on the person he was, Oscar has a difficult time explaining the event.

A Sentence Appropriate For the Crime

The most important question presented in this case is what quantity of time is sufficient

to reflect the seriousness of the offense, to promote respect for the law, and to provide for just

punishment. Likewise, this Court is required to avoid unwarranted sentencing disparities

between similarly situated defendants. In this case, the application of the terrorism enhancement

would impose a sentence grossly in excess of the defendant's conduct and would create an

inexplicable difference between Oscar Ortega and another recently sentenced defendant in this

jurisdiction.

The defense has previously contested the manner in which the "terrorism enhancement"

was forced upon the defendant and we continue to believe that due process requires some

judicial fact finding with respect to its application. For purposes of this sentencing memorandum,

it is clear that the enhancement has a draconian impact on his guideline range, increasing it from

Level 13, which carries a potential sentence of 12-18 months (and falls within Zone C or the

guidelines which authorizes a split sentence of incarceration and home detention) to 168-210

months. Numerous courts have recognized that the impact of the enhancement is "unequivocally

severe," United States v. Benkahla, 501 F.Supp.2d 748 (E.D. Va. 2007) and have used their

authority under the sentencing guidelines to ameliorate its unjust result. In United States v.

Mandhai, 375 F.3d 1243,1249 (11th Cir. 2004), for example, the Court of Appeals noted that the

application of the enhancement was excessive and "prevents the penalty from fitting the crime."

Although the Court of Appeals in Mandhai remanded so that the district court could further

articulate its reasons for the downward adjustment, the court was clear about its disdain for the enhancement:

> It is easy to forget that the Sentencing Guidelines are merely that-guidelines. Any attempt to remove all judicial discretion in sentencing would raise serious concerns about the separation of powers. Any sound legal basis, justified by the facts and not inconsistent with the sentencing statutes can be a proper ground for departure. The requirement is that the reasons for the departure be set forth with clarity and that it be consistent with the sentencing statute.

375 F.3d at 1250. See also United States v. Parr, 545 F.3d 491 (7th Cir. 2008)(district court judge reduced sentence by twenty years after application of terrorism enhancement; reversed on other grounds).

Moreover, in another case recently decided in this jurisdiction, the Government did not even seek to impose the terrorism enhancement against a defendant who launched a pre-meditated attack against the White House and the uniformed Secret Service agents assigned to guard the President. The details of that case – *United States v. Joseph Reel* – are set forth in more detail in the defendant's prior pleadings in this case, but even a summary of the evidence reveals both the similarity of facts between these two cases and the disparate result sought by the Government. On June 9, 2013, Joseph Reel aimed his Jeep Patriot SUV at one of the occupied guard booths that surround the White House. The Secret Service would later search and recover from the Jeep: (1) 100 rounds of live .45 caliber ammunition; (2) 100 rounds of .22 caliber ammunition; (3) eight knives; (4) two machetes; and (5) a hand held "spotting scope." Reel used this distraction to jump over the fence adjacent to the Old Executive Office Building and was finally arrested approximately forty feet away from the fence that constitutes the inner perimeter of the White House residence. A subsequent search of Reel's apartment resulted in the seizure of: (1) a Glock .45 caliber pistol; (2) a Taurus .22 caliber handgun; (3) four hunting knives; (4) a

"spear;" (5) a "sword;" (6) one baseball bat with "spikes" affixed to the barrel; (7) two ballistic masks; (8) a gas mask; and (9) a metal face shield.

The investigation of Reel revealed that he was angry over actions taken by the Internal Revenue Service and the Department of Homeland Security. Indeed, Reel had posted a YouTube that encouraged citizens to round up their friends and travel in vehicles "modified for combat" in order to "crush everything that gets in your way." He also offered "one million dollars in compensation – compensation for every confirmed kill of every enemy of this nation." Reel then identified who these enemies are: "anyone wearing black armored uniforms and . . . any soldier and law enforcement that doesn't stand down, or refuses to stand with us . . . they're also fair game."

Reel entered into a plea agreement with the U.S. Attorney's Office for the District of Columbia that charged him only with Assaulting an Officer of the United States With a Dangerous Weapon, in violation of 18 U.S. Code 111(b). Even though this assault count carries a maximum punishment of up to twenty (20) years, the plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) provided for only **thirty-five months of incarceration**. The plea agreement makes absolutely no mention of the terrorism enhancement.

The unreasonableness between the Government's treatment of Reel and the sentence sought in this case could not be more stark. While it is true that Oscar used a firearm during the commission of his offense, he will be separately punished for that conduct with a mandatory ten year jail sentence. This Court has the independent obligation under the federal sentencing guideline factors to avoid exactly the type of unwarranted sentencing disparity sought by the Government in this case. No one – including Oscar Ortega – says that he should not be punished. No one – including Oscar Ortega – can deny the potential risks his actions caused. But no one –

particularly not the Government – can legitimately argue that it is rationale to agree to a thirty-three month sentence for Joseph Reel for assaulting a Secret Service agent and at the same time ask for fifteen years for Oscar Ortega's destruction of property.

The notion of mercy as an element of justice has long been a part of the Anglo-Saxon heritage that underlies the moral, political and social foundation of this country. As Shakespeare wrote: "earthly power is most like Gods when mercy tempers justice." In this case, the need to punish demands jail time for Oscar, but under the totality of circumstances of the case – his youth and confused mental state at the time of the offense, and the opportunity for rehabilitation - a sentence of ten years is an appropriate punishment.

The Remaining Sentencing Factors

The remaining sentencing factors include the need for specific and general deterrence and to provide appropriate treatment during confinement. With respect to specific deterrence, there is every reason to believe that Oscar will never again commit any criminal offense. Dr. Madsen's report discusses Oscar's much improved insight into his own behavior and concludes that Oscar's journey towards becoming a productive member of society has already begun. In short, Oscar is not the person that he once was.

As proof of his evolving self awareness, Oscar has been singularly productive while incarcerated. Oscar has completed the following five programs:

1. GED Certificate on October 17, 2012
2. Parenting Class on March 3, 2013
3. Drug and Alcohol Education Class on March 19, 2013
4. Prosperous Venture Class on June 25, 2013
5. Career Readiness Certificate on January 3, 2014

The certificates are attached hereto as Exhibit B. Finally, by virtue of hard work Oscar has become a trustee in the Northern Neck Regional jail facility and spends his nights cleaning the facility.

Likewise, general deterrence will also be served by a ten (10) year sentence. This case has been followed in great detail by the public news. The arrest, prosecution and plea of the defendant are a matter of public knowledge. No further deterrence would be accomplished by a great sentence. And to be fair, persons who commit these types of offenses are frequently motivated by irrational thoughts and are not focused on consequences.

Finally, the defendant requests that he be designated to the FCI Phoenix, Arizona (or another available BOP facility located closest to Idaho Falls, Idaho) so that he can be as close as possible to his family and son. Moreover, the defense requests an order designating Oscar for whatever mental health treatment services are available at his designated correctional facility. The defense also agrees to whatever conditions of probation the Court deems necessary, including travel restrictions, closely supervised monitoring, and the like.

## CONCLUSION

The purpose of the criminal law is not merely to punish – and the defense hopes that the Court will recognize that Oscar Ortega-Hernandez is not beyond redemption. Oscar wants more than it is possible to express in words to return to Idaho Falls to embrace his family, assist his parents and most importantly, to be a father to his son. Oscar has shown he is industrious and now understands more clearly the chaos that he created. He is not afraid of hard work and understands that this conviction will follow him for the rest of his life. Oscar has a loving family

in Idaho Falls that will provide support upon his eventual release.  A sentence of ten (10) years would be appropriate.

                              Respectfully submitted,


                              *Robert Feitel*
                              _____
                              Robert A. Feitel
                              1712 N Street, N.W.
                              Washington, D.C. 20036
                              D.C. Bar 366673
                              202 255 6637
                              RF@RFeitelLaw.com

                              On behalf of
                              Robert A. Spelke
                              Sandi Rhee
                              Ortega Defense Team

## CERTIFICATE OF SERVICE

I certify that on March 20, 2014, a copy of this Memorandum in Aid of Sentencing was served via CM/ECF to all case registered parties.


*Robert Feitel*
_____

Robert Feitel