## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.  12-CR-00014 (RMC)** |
| **v.** | : | |
| | : | |
| **OSCAR R. ORTEGA-HERNANDEZ** | : | **Sentencing:  March 31, 2014** |
| **Defendant.** | : | |

## GOVERNMENT MEMORANDUM IN AID OF SENTENCING

Ortega-Hernandez said "that he wanted to kill Obama and that the President was the devil and the anti-Christ."
- *Statement of Oscar Ramiro Ortega-Hernandez's girlfriend W-4 to the United States Secret Service.*

"Oscar hates Obama and plotted to kill him."
- *Statement of Oscar Ramiro Ortega-Hernandez's girlfriend W-4 to her friend W-9.*

Ortega-Hernandez stated he wanted "to take out Obama."  He described himself as "the modern day Jesus" and "it was his mission from God."
- *Statements of Oscar Ramiro Ortega-Hernandez at his birthday party in October 2011.*

******

On the night of November 11, 2011, Oscar Ramiro Ortega-Hernandez ("Ortega-Hernandez" or "the defendant") attempted to assassinate the President of the United States by firing round after round from his semi-automatic assault rifle at the residential section of the White House.  Ortega-Hernandez's calculated attack jeopardized the lives of the First Family, White House staff and employees, the United States Secret Service ("USSS"), and tourists and innocent bystanders located on the Ellipse, at the south fence of the White House, and in Lafayette Square.  Ortega-Hernandez's calculated attack was the culmination of months during

which the defendant fulminated against the President, whom he perceived to be the Anti-Christ and the devil, made threats against him, and prepared to take violent action against him. To accomplish his goal, Ortega-Hernandez traveled more than 2,000 miles by car from Idaho Falls, Idaho, to Washington, D.C., with his assault rifle and more than 180 rounds of ammunition.

On September 18, 2013, just a week and a half before his trial was set to begin, and faced with overwhelming evidence of his guilt, Ortega-Hernandez pled guilty to two of the 19 counts with which he was charged: Injury to a Dwelling and Placing Lives in Jeopardy (Count Five) and Discharging a Firearm During a Crime of Violence (Count Eleven). Count Five is one of the predicate crimes that are defined as a federal crime of terrorism. See 18 U.S.C. § 2332b(g)(5)(B)(i). As a result, Ortega-Hernandez agreed that the terrorism adjustment set forth in United States Sentencing Guidelines ("U.S.S.G.") § 3A1.4 applied to the facts in this case – that he was guilty of Count Five and that his criminal actions were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Therefore, Ortega-Hernandez's sentencing guidelines range is **24 to 27.5 years imprisonment**. Ortega-Hernandez's criminal actions were a direct threat to the national security of the United States and warrant a severe sentence – not only to punish the defendant for his actions, but also to safeguard the lives of the President and the First Family from him. In addition, a severe sentence in this case would serve as a strong deterrent to any other domestic terrorists who would seek political change in this country from behind the trigger of an assault rifle. Accordingly, the United States respectfully requests that the Court sentence the defendant to a combined term of **imprisonment of 27.5 years** in this case.

## FACTS RELEVANT TO SENTENCING
### A.  Preparation for the Attack

Ortega-Hernandez began planning his attack on the President eight months prior to his arrival in the District of Columbia.  Specifically, on March 19, 2011, Ortega-Hernandez purchased a Romanian Cugir SA semi-automatic (AK-47-style) assault rifle from W-12 in Idaho. W-12 sold the weapon to Ortega-Hernandez for $550.  Ortega-Hernandez then purchased more than 1,200 rounds of ammunition to use with the weapon.  Over the course of the next six months, Ortega-Hernandez practiced firing the assault rifle at a desolate crater located on land owned by the Bureau of Land Management outside of Idaho Falls, Idaho.  Friends who went with Ortega-Hernandez to practice shooting stated that he would go off by himself, practicing assault drills and sniper shooting.  Ortega-Hernandez's best friend, W-11, described the defendant as shooting targets while moving quickly from rock to rock.  W-11 explained that Ortega-Hernandez "acted like the soldiers in the video game Call of Duty."  Another friend, W-9, stated that Ortega-Hernandez brought paper target with a human silhouette to the crater at which to practice his aim.  W-9 stated that Ortega-Hernandez would lie prone on a rock and shoot targets at a distance.

In approximately August 2011, Ortega-Hernandez purchased a scope kit on the Internet and asked W-13 to install it on the weapon for him.  That scope kit included a mount, a scope, a laser sight, and a flashlight.  After the scope was installed, Ortega-Hernandez again took the weapon out for shooting practice with W-13.  According to W-13, Ortega-Hernandez practiced shooting at items like a home stereo amplifier, an empty ammunition case, a video cassette recorder, and a stereo speaker from a distance of approximately 300 yards.

### B.  Ortega-Hernandez's Intent Underlying the Attack

Beginning in or about 2010, Ortega-Hernandez began making repeated statements to many of his friends and associates in Idaho about his contempt for the federal government, and espoused numerous theories regarding how the federal government was seeking to control Americans.  For instance, on several occasions, Ortega-Hernandez explained to several friends and associates that the federal government was seeking to implant Global Positioning System ("GPS") chips in children as a means to track them.  Ortega-Hernandez also told his friends that the federal government used fluoride and aspartame to control the American people.  In a videotaped statement, recorded on September 16, 2011, Ortega-Hernandez made the following statements with respect to the federal government:

- The United States government was "bully[ing] all the other countries to get what we want;"

- "Our government deceives the American people so that us or the army can go steal other countries' goods [and] oil;"

- "From the fluoride in our toothpaste to the aspartame in the majority of all the things we consume, the FDA makes all the companies put that in stuff we consume…to dumb us down;"

- "Because if the whole world, or the whole United States, would have smoked cannabis freely like alcohol is consumed, I believe that we would all be so much more intelligent beings, and the government knows that.  That's why it's illegal, because if we were all more intelligent as a whole it would be harder to deceive us.  So they just keep marijuana illegal because they know there will always be a population that will follow the rules."

- "The government sees themselves as better than the general population.  Like they're on a different level.  They call themselves the Illuminati, like the Enlightened Ones;"

- "And right now, we're in war for being greedy with oil and we're also deep in the war on drugs, so right now we're fighting two wars.  One war to basically stay away from exercise and the second war to keep us from marijuana."

- "Because the government is fighting, or should I say, bullying, these other countries for their oil, our freedom is at stake because of it.  Because now we are far from free.  I mean now we have to live in fear of getting nuked because of what our government has dragged us into.  I mean think about it: we were never given a choice on what to do about this oil crisis.  We were only given one choice, and that was to fight, or war."

Ortega-Hernandez also made it no secret among many of his friends and associates in Idaho that he held deep contempt for President Obama.  On numerous occasions, to numerous people, including his closest friends and associates, Ortega-Hernandez openly expressed his hatred for the President and vowed "to take him out."

For example, W-4, Ortega-Hernandez's girlfriend, stated that Ortega-Hernandez's statements against the President began in 2010, a year prior to the attack.  In January 2011, a friend reported to W-4 that the defendant watched numerous anti-Obama videos on YouTube and other Internet sites.  W-4 responded that "Oscar hates Obama and plotted to kill him."  In days immediately after Ortega-Hernandez's attack on the White House, W-4 explained to her mother that Ortega-Hernandez "wanted to kill President Obama and that President Obama is the anti-Christ."  W-4 also told the USSS that Ortega-Hernandez "wanted to kill Obama and that the President was the devil and anti-Christ."  Two days later, W-4 told a different USSS agent that the defendant "doesn't like Obama, Obama is the anti-Christ, and Ortega-Hernandez would hurt him."

W-11, who described himself as one of Ortega-Hernandez's best friends, recalled that the defendant referred to himself as "the modern-day Jesus" and that "Obama was the anti-Christ and was putting computer chips in children."  W-11 also remembered that Ortega-Hernandez

stated to his friends that "they needed to get Obama out of office and he was the one to do it." The defendant implored his friends to stock up on guns and ammunition, and explained that "they needed to fight the government in order to prevent the end of the world in 2012."  On a different occasion, while smoking marijuana, Ortega-Hernandez told W-11 and other friends that "we need to take out Obama and jump start the re-revolution."  The defendant also stated that "Obama is the anti-Christ" and it was his "mission to take Obama out."  W-11 explained that Ortega-Hernandez told him that the Bible had described the anti-Christ as a "dark figure" in power, whom Ortega-Hernandez believed to be President Obama.

Another of the defendant's friends, W-7, stated that Ortega-Hernandez described himself as "the modern-day Jesus Christ" and President Obama "was the anti-Christ."  W-7 also stated that Ortega-Hernandez had said at a party at her house that "Obama needed to be taken care of" and that "I'm not going to stop until I'm done."

At his own birthday party in October 2011, shortly before he left Idaho, Ortega-Hernandez called all his friends into the living room and read to them for 45 minutes from the blue journal that he always kept with him.  Ortega-Hernandez read to his friends, including W-9, that he "wanted to take out Obama" and that "it was his mission from God."  Ortega-Hernandez explained that "the government is working with the Illuminati and is putting aspartame in our food to dumb us down."  Ortega-Hernandez warned his friends to be prepared "for a long war."

W-10, another friend of Ortega-Hernandez, stated that the defendant, at a party at her house, referred to himself as "the modern-day Jesus Christ" and that President Obama was "a little bitch" and "the anti-Christ."  W-10 reported that Ortega-Hernandez claimed that the government was implanting computer chips in children to track them.  W-10 also said Ortega-

Hernandez stated that "somebody needs to take care of Obama" and that he was "the person to do it."

W-14, another friend of Ortega-Hernandez, reported that on an occasion at W-14's house, the defendant described himself as "the modern-day Jesus Christ," and that "the President was the devil because we keep doing bad things over oil." W-14 explained that Ortega-Hernandez stated, "we are going to fuck over our country and get bombed. Obama needs to get out of office." Ortega-Hernandez also stated that "something big was going to happen" at which point W-14 would know "then that he was Jesus." At another occasion at W-14's house, Ortega-Hernandez stated, "Obama was the devil and we need to get him out of office." The defendant explained that "we're going to get bombed because we are pissing off so many countries."

W-51, who described himself as Ortega-Hernandez's childhood best friend, reported that on an occasion at W-51's house, the defendant described himself as "the modern-day Jesus Christ," and that "the government is putting aspartame in our food to dumb us down." W-51 also explained that Ortega-Hernandez said that "God sent him on a mission to stop the government." W-51 stated that Ortega-Hernandez praised Osama bin Laden for standing up to the United States, and referred to President Obama as "the devil." Based on his conversation with the defendant, W-51 believed that Ortega-Hernandez wanted to kill the President of the United States, but did not take the defendant seriously since they lived in Idaho.

W-55, who described himself as an acquaintance of Ortega-Hernandez, reported that he watched anti-government and anti-Obama videos on YouTube with Ortega-Hernandez. The videos were about the government putting GPS chips in people, the New World Order, and the concept of one world government. W-55 explained that Ortega-Hernandez believed that the

events of 2012[1] did not have to happen if people would change, but he saw the President as "the face/front man of the disaster that is coming and that Obama won't do anything for the country and is ruining it."

W-21 did not know Ortega-Hernandez personally, but was contacted by the defendant to help edit a video in June 2011. W-21 met with Ortega-Hernandez at the restaurant owned by the defendant's parents on July 8, 2011. During the meeting, Ortega-Hernandez asked W-21 if he believed in the book of Revelations and the end of the world. Ortega-Hernandez told W-21 that the federal government was seeking to implant GPS chips into children, which the defendant believed was "the mark of the beast just like the anti-Christ would do" as described in Revelations.[2] Shortly after Ortega-Hernandez made these statements, W-21 ended the meeting and declined to assist the defendant with his video project.

The United States submits that all of these comments on these various occasions to his girlfriend, best friend, other friends and associates, and even a stranger in Idaho clearly demonstrate Ortega-Hernandez's motivation to undertake the criminal actions that he did. Specifically, Ortega-Hernandez intended to assassinate the President of the United States to stop what he believed was the end of the world in 2012. As a result, Ortega-Hernandez's criminal actions, including his intent to injure a dwelling and placing lives in jeopardy, were undertaken "to influence or affect the conduct of government by intimidation or coercion, or to retaliate

---

[1] According to friends and associates in Idaho, Ortega-Hernandez believed that the end of the world would occur in 2012, as supposedly revealed by an ancient calendar used by the Mayan civilization. At the time of his arrest in Indiana, Pennsylvania on November 16, 2011, Ortega-Hernandez had in his pocket a copy of the Mayan alphabet.
[2] See e.g., Revelations 14:9-11 (New American Bible, Revised Ed.) ("A third angel followed them and said in a loud voice, 'Anyone who worships the beast or its image, or accepts its mark on forehead or hand, will also drink the wine of God's fury, poured full strength into the cup of his wrath, and will be tormented in burning sulfur before the holy angels and before the Lamb. The smoke of the fire that torments them will rise forever and ever, and there will be no relief day or night for those who worship the beast or its image or accept the mark of its name.'").

against government conduct." 18 U.S.C. § 2332b(g)(5)(A). This intent is further corroborated by the videos Ortega-Hernandez made shortly before departing Idaho.

### C. Ortega-Hernandez's Departure Videos

On October 23, 2011, the same day he departed Idaho Falls, Ortega-Hernandez went to his best friend W-11's house, and asked W-11 to record a video of him. Ortega-Hernandez, standing in the back yard of W-11's house, proceeded to read from his blue journal while W-11 used his i-Pod to record two videos. In one video, Ortega-Hernandez praised Osama bin Laden for having the courage to stand up to the United States, and called for a revolution against the federal government. Specifically, Ortega-Hernandez stated:

> Okay, so now everybody knows about the bad things that Osama Bin laden did. But does anybody know why he did all the things that he did? You see, I think this man is the only one that had the balls to stand up and say our people have had enough of all these years of bullying and killings and unfairness with the oil. I think Osama's the only one brave enough to stand up to the strongest, most powerful country in the world.
> …
> I mean think about it. Say you had a small farm that you worked so hard to sustain and to success to feed and support your family. How would you feel or how would you react to another group of people coming onto your farm and taking the majority of all your cattle and crops that you worked so hard to feed your family with for nothing in return? Would you sit and watch like a coward or would you take [a] stand like a man?
>
> See that's exactly what Osama did. That's exactly how it is for the Iraqi people. We have had our troops in their country for years and more years just putting the Iraqi people in line if any of them want to mess up our plan to steal their oil.

In the second video recorded by W-11, Ortega-Hernandez stated:

> Although I say I am Jesus, I don't want you to think of me as this overly nice person, which I am, but I don't want to be portrayed as a soft hearted, fluffy bundle of joy even though I feel like I am the happiest man alive. I am a cold hearted warrior of God and that is exactly what I want to be portrayed as.

> You see everybody, it's time for Armageddon. It's time for a revolution. It's time to take stand and stop letting this corrupt government rule us with an iron fist. It's time to stop letting the Illuminati tell us what to do. It's time to live by our own rules and regulations. Instead of one world under the Illuminati, it's time for one world under gods, indivisible with liberty and justice for all.

### D. Ortega-Hernandez's Travel to Washington, D.C.

Following the recording of the videos, Ortega-Hernandez packed his 1998 black Honda Accord with some personal possessions and left Idaho Falls that same day, driving eastbound. Ortega-Hernandez brought his Romanian Cugir SA semi-automatic assault rifle with him, as well as over 180 rounds of ammunition. Ortega-Hernandez did not tell anyone, not even his family, friends, girlfriend, or child, that he was travelling to Washington, D.C.

On October 25, 2011, Ortega-Hernandez paid a surprise visit to W-16 and W-17, who were temporarily residing in Indiana, Pennsylvania. Ortega-Hernandez remained in the company of W-16 and W-17 for at least two weeks as a guest, even traveling to New York City with them for an overnight trip with their family. During the course of his stay with W-16 and W-17, Ortega-Hernandez never showed either of them the semi-automatic assault rifle that he had brought with him from Idaho. According to W-17, Ortega-Hernandez left Indiana, Pennsylvania, at some time between November 7 and November 9, 2011. He traveled from there to the Washington, D.C. area.

It is believed that the defendant arrived in the Washington area on November 10, 2011. At about 10:00 AM on the morning of November 11, 2011, police officers in Arlington County, Virginia, stopped Ortega-Hernandez in response to a report that he was a suspicious person looking into houses. The police photographed him wearing a black hooded LA Dodgers jacket.[3] See Exhibit A. At approximately 4:45 PM in the afternoon of November 11, 2011, Ortega-Hernandez went to a Walmart store in Fairfax, Virginia, returned a gun sling, and purchased a number of items. Ortega-Hernandez appeared on surveillance video recovered from that store, and has been identified by W-20 who saw him in the store that day. See Exhibit B.

### E. Ortega-Hernandez's Attack on the White House

Later that night, shortly before 9:00 PM, Ortega-Hernandez was driving his car westbound on Constitution Avenue when he stopped in the middle lane directly across the Ellipse from the South Lawn of the White House.[4] Ortega-Hernandez stopped his vehicle immediately in front of a Super Shuttle van which was ferrying visitors to the District of Columbia from Reagan National Airport to their respective hotels. With the passenger-side window of his car lowered, he pointed his semi-automatic assault rifle out the window of the car and aimed directly at the White House. The defendant then opened fire on a residential section of the White House.

Witnesses in the Super Shuttle heard between five and ten very loud, consistent shots from the dark colored sedan stopped directly in front of them. Some witnesses in the van also saw puffs of smoke and the smell of gunpowder emanating from the passenger-side of the vehicle. The shots were directed towards the Ellipse and the White House. Following the shots,

---

[3] At the time of the stop, Ortega-Hernandez refused to allow the officers to search his 1998 black Honda Accord.
[4] On the night of November 11, 2011, there was construction occurring on Constitution Avenue in the westbound direction. As a result, only the middle lane was open to westbound traffic.

witnesses described the vehicle swerving into the closed left lane, and driving erratically and at a high rate of speed in the westbound direction.  Witnesses in the Super Shuttle described a sense of shock and disbelief at what they had just witnessed.

Moments later, the defendant crashed his vehicle near the ramp from Constitution Avenue to the Theodore Roosevelt Bridge in front of the U.S. Institute of Peace.  A security guard working for the U.S. Institute of Peace stated that he heard the screeching of tires, and turned around to see the vehicle lose control, spin around, and hit the curb, cracking the rear axle.  See Exhibit C.  After efforts to restart the vehicle failed, Ortega-Hernandez quickly ran from the car on foot, leaving behind many items of evidence implicating himself.   Law enforcement officers who later searched the car recovered the following items, among others:

- the Romanian Cugir SA semi-automatic assault rifle with a large scope mounted on the top portion of the weapon and a magazine attached to it.  There were approximately sixteen 7.62 x 39 mm cartridges loaded in the magazine and one additional round ready to fire in the chamber of the rifle;

- twelve spent shell casings for 7.62 x 39 mm cartridges which the Federal Bureau of Investigation ("FBI") Laboratory has concluded were all fired from Ortega-Hernandez's rifle;

- three additional magazines fully-loaded with an additional ninety-three 7.62 x 39 mm cartridges;

- five boxes of 7.62 x 39 mm cartridges;

- a black hooded Los Angeles Dodgers jacket identical to the one Ortega-Hernandez had been photographed wearing earlier that day in Arlington County, Virginia; and

- receipts from the Walmart store in Fairfax, Virginia, where Ortega-Hernandez had returned the gun sling and purchased additional items earlier that day.

See Exhibit D.  The weapon was registered to W-12 and was purchased at a gun store in Idaho Falls, Idaho.  W-12 identified this weapon as the same weapon W-12 sold to Ortega-Hernandez

on March 19, 2011, except for the addition of the used scope. W-13 has stated that this rifle is the one on which W-13 installed a scope kit at the request of Ortega-Hernandez. The car itself was registered to Ortega-Hernandez and his mother.

Also recovered from the vehicle was a handwritten note which appears to be a sketch of a video Ortega-Hernandez was intending to make. At the top of the note it states, "maybe in the intro have it say in text something like 'this is an infomercial intended to open our eyes. WAKE UP PEOPLE!!!'" The rest of the note reads [all errors in original]:

> 45 seconds of Tupac "changes" at the end of 45 seconds. It's gotta end with the part of when he says "now it's on us as the people to do what we gotta do to survive." And as that is said in text it's gonna say somethin like "people 2012 doesn't have to happen." And in the middle of the explanation in clips it's gonna show the open bible where it shows that the bible warns us of whats gonna happen. Clip of all the stuff on youtube about this subject. Clip of chip already bein in all new passports. Clip of chip already bein in dog's. Clip of chip already being in willing family's.

Underneath the above paragraph, Ortega-Hernandez drew a schematic of the video he was envisioning with the written out text that would accompany the various video clips he wanted to include. The schematic of the video included the following messages [all errors in original]:

> *Clip 1*
> This is an infomercial intended to open the eyes and minds of today's society.
> *Fade to Clip #2*
> Do you believe in God or a higher power?
> *Fade to Clip #3 – show clip of bible saying about man of great power*
> Well in the bible it is said that there will be a person of great power that everybody loves and that this person is going to make everybody who wants to buy sell or live here wear a mark in order to buy sell or live here
> *Show bible pic clip then fade to Clip #4*
> Hearing this we the people think to ourselves that nobody can make me do anything I don't want to do, right?
> *Fade to Clip #5*
> Well this person is smart and he already knows that, that's why they're going to go about it with a different approach. Well I'm sure we've all heard of all these kidnappings and taking people for ransom all over the news well this person is

going to come out n say I know we have an epidemic well I have a solution we
can use these chips to eliminate this problem by just putting them in our children.
It's safe we already use them in our dogs this plan is full proof so now everybody
willingly puts them in our children
*Show clips of pics of chips in dog's and of chip alone*

<u>See</u> Exhibit E.

## F.  FBI Laboratory Analysis

The FBI Laboratory conducted a fingerprint analysis of the ammunition magazines

recovered from the vehicle and found ten latent prints of value on two of the magazines.  All ten

of these latent fingerprints have been identified as fingerprints of Ortega-Hernandez.  The FBI

Laboratory also conducted a fingerprint analysis of the interior of the vehicle.  The FBI identified

three latent prints of value inside the car: one on the driver's-side door handle, one on the

driver's seat belt, and one on a dietary supplement bottle.  All three of those latent fingerprints

have been identified as fingerprints of Ortega-Hernandez.

The FBI also conducted a chemical analysis of the interior of the vehicle.  The FBI

Laboratory identified vaporous lead residue consistent with the discharge of a firearm on the

exterior of the passenger-side door along the window trim, interior side of the windshield on the

passenger-side near the "A" pillar, rear passenger-side headliner, and passenger-side interior

door panel.  Particulate lead consistent with the discharge of a firearm was discovered on the

passenger-side seat and seat back, exterior of the passenger-side door, passenger-side dashboard,

passenger-side window frame, interior passenger-side windshield, passenger-side "B" pillar, rear

passenger-side headliner, and a CD case located on the passenger-side visor.

## G.  Damage to the White House and Placing Lives in Jeopardy

The FBI examined the area around the White House and located approximately eight bullet impact points on the south side of the building on or above the second story.  See Exhibit F.  That area of the White House is widely known to be the residence of the First Family.  The impact points included a broken window in the center of the Truman balcony, a window sill on the east side of the Truman balcony, multiple impacts points causing damage to the façade of the center of the building on the second and third stories, and a bullet hole near the roof of the building.  See Exhibit G.  Two bullets were also recovered from the White House: one from a window frame on the east side of the Truman Balcony and one found on the ground east of the South entrance.  The FBI Laboratory has determined that both of those bullets were fired from Ortega-Hernandez's Romanian Cugir SA semi-automatic assault rifle.  The FBI also recovered a bullet jacket that was found in the window sill of the Truman Balcony, which was also determined to have been fired from Ortega-Hernandez's Romanian Cugir SA semi-automatic assault rifle.[5]  Total damage done to the White House was approximately $97,757.93.

At the time of the shooting, the President of the United States and the First Lady were not present at the White House.  Two members of the First Family were present within the residence of the White House, however, but were unharmed.

At the time of the shooting, USSS Officers Todd Amann and Jeff Lourinia were stationed on the northeast section of the roof of the White House.  One of the bullets fired by Ortega-Hernandez struck the roof of the White House within approximately 20 feet of where Officers Amann and Lourinia were stationed.  See Exhibit H.  Officers Amann and Lourinia each

---

[5] Several fragments were also collected in that area but could not be identified or eliminated as having been fired from that rifle.

reported hearing approximately six shots fired. USSS Officer Carrie Johnson was stationed at the South Portico underneath the Truman balcony at the time of the shooting. Several of the bullets fired by Ortega-Hernandez struck the Truman balcony directly above where Officer Johnson was stationed. Officer Johnson heard approximately six to eight shots and the sound of what she believed to be debris falling from above. Officer Johnson took cover behind the stairwell, drew her firearm, and readied a shotgun.

Another bullet was located on the roof of St. John's Church, located at the corner of Sixteenth and H Streets, N.W., across Lafayette Square from the White House. See Exhibit I. The FBI Laboratory concluded that the bullet recovered from the roof of St. John's Church was fired from Ortega-Hernandez's Romanian Cugir SA semi-automatic assault rifle.

### H.  Ortega-Hernandez's Flight from Law Enforcement

Soon after law enforcement identified the defendant as one of the owners of the vehicle, he became the subject of a multi-agency manhunt that crossed several jurisdictions. Three days after the shooting, on November 14, 2011, W-18 was in the area of Shenandoah Junction, West Virginia, photographing trains. W-18 is a former FBI photographer who takes photographs of cargo trains as a hobby. W-18 noticed an individual riding inside one of the empty hopper cars. W-18 thought this was rare and took a picture. Later, W-18 noticed that the stowaway he had photographed looked like Ortega-Hernandez and contacted law enforcement. See Exhibit J. Friends of Ortega-Hernandez have viewed that photograph and have confirmed that this photograph is one of Ortega-Hernandez. The cargo train that Ortega-Hernandez had boarded was headed northwest from Washington, D.C.

On November 15, 2011, Ortega-Hernandez was seen standing outside the Midway Car Wash in South Greensburg, Pennsylvania, and asking for a ride.   W-67 picked up Ortega-Hernandez and drove him to the Walmart in Greensburg, Pennsylvania.   At the Walmart, Ortega-Hernandez purchased some additional items and was captured on the store's surveillance video. See Exhibit K.

### I.  Ortega-Hernandez's Arrest and Statement

On November 16, 2011, Ortega-Hernandez was arrested by Pennsylvania State Police ("PSP") troopers, at the same hotel where he had stayed with W-16 and W-17 the previous week in Indiana, Pennsylvania.   See Exhibit L.   Recovered from Ortega-Hernandez's person at the time of his arrest was a copy of the Mayan alphabet.   See Exhibit M.   Following his arrest, agents of the FBI and USSS arrived at the PSP barracks in Indiana, Pennsylvania.   Upon their arrival, Ortega-Hernandez was escorted into an office of one of the PSP troopers.   While he was being escorted into the office, Ortega-Hernandez voluntarily stated, "Do you think I shot at the White House?  I heard someone say that I shot at the White House?"

Ortega-Hernandez was asked if he could read, write, and understand English, to which he responded that he could.   Ortega-Hernandez was read his Miranda rights by FBI Special Agent Bernard from the standard FBI "Advice of Rights" form, also known as the FD-395.   In addition to having the form read to him, Ortega-Hernandez was also given the FD-395 form to review. After being read and personally reviewing the FD-395 form, Ortega-Hernandez informed the agents that he understood his Miranda rights, and was willing to talk to them.   To memorialize the decision, Ortega-Hernandez signed the consent portion of the FD-395 form.

Following the waiver of his rights, Ortega-Hernandez admitted that he was the owner of a 1998 black Honda Accord.  He also admitted to being present in Washington, D.C., on November 11, 2011, and being stopped by the Arlington County police officers.  However, Ortega-Hernandez claimed that he had been the victim of a brazen daylight robbery at about 3:00 PM on November 11, 2011, outside of a Popeye's Chicken restaurant.  The purported robber pulled a gun on him and took his wallet, his keys, his car and its contents.  When asked if he knew about the shooting at the White House on November 11, 2011, Ortega-Hernandez replied that it must have been done by the person who stole his car.  Ortega-Hernandez also claimed that he had never owned a firearm, including an AK-47 or any similar type of weapon.

## ARGUMENT
### A.  Introduction

Faced with the overwhelming evidence against him and the enormity of his crimes, Ortega-Hernandez pled guilty just a week and a half before his trial was set to begin to two of the 19 counts with which he was charged.  Specifically, Ortega-Hernandez pled guilty to: Injury to a Dwelling and Placing Lives in Jeopardy (Count Five) and Discharging a Firearm During a Crime of Violence (Count Eleven).  Count Five is defined as a federal crime of terrorism when it is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  See 18 U.S.C. § 2332b(g)(5)(A)&(B)(i).  Moreover, Ortega-Hernandez agreed that the terrorism adjustment set forth in U.S.S.G. § 3A1.4 applied to the facts in this case.  Count Five carries a maximum term of imprisonment of 20 years, while Count Eleven carries a maximum term of life imprisonment, and a mandatory minimum sentence of ten years imprisonment consecutive to any other sentence.  As a result of the terrorism adjustment, Ortega-Hernandez's sentencing guidelines range is **24 to 27.5 years imprisonment**.

Given the magnitude of Ortega-Hernandez's criminal actions, the unmistakable intent underlying them, and the many lives he endangered, the United States respectfully submits that the high end of the guidelines range, **27.5 years imprisonment** is the appropriate sentence in this case. Moreover, such a sentence would adequately punish the defendant for his actions, protect the President and the First Family from him for the foreseeable future, and deter any other would-be domestic terrorists from attempting to copy Ortega-Hernandez's criminal actions.

### B.  The Sentencing Guidelines

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court ruled that the United States Sentencing Guidelines are no longer mandatory.    However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence.  Gall v. United States, 552 U.S. 38, 49 (2007).  While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 109 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).    The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  Kimbrough, 552 U.S. at 109 (quoting Rita v. United States, 551 U.S. 338, 350 (2007)).  As one member of this Court has held, "Booker requires judges to engage in a two-step

analysis to determine a reasonable sentence." United States v. Doe, 413 F. Supp.2d 87, 90 (D.

D.C. 2006) (Bates, J.).

> [A] district court shall first calculate (after making the appropriate findings of fact) the
> range prescribed by the guidelines.  Then, the court shall consider that range as well as
> other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.]
> § 3553(a) before imposing sentence.

United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence,

the Court should consider not only the nature and circumstances of the offense and the history

and characteristics of the defendant, but also the applicable sentencing objectives—that is, that

the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3)

provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6)

effectively provide the defendant with needed educational or vocational training and medical

care.  See 18 U.S.C. § 3553(a)(1) and (2).  In addition, the sentence should reflect "the need to

avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

### C.  The § 3553(a) Factors Warrant a Substantial Period of Incarceration

#### 1.  The Nature and Circumstances of the Offenses

Unquestionably, on November 11, 2011, Ortega-Hernandez was intending to assassinate

the President of the United States.  While the method he chose, firing an assault rifle from more

than 650 yards away, had a limited chance for success, that fact alone does not alter the horrific

and serious nature of the defendant's actions and intent.[6]  The USSS ensures that there is no high

---

[6]  At the time of Ortega-Hernandez's attack on the White House, shortly before 9:00 PM on November 11, 2011, the
President and the First Lady were not present at the White House, having left approximately eight hours earlier to

percentage chance for success in such an endeavor, and thus, the only options available to the defendant were those with a limited chance for success. Although the President was the target of his attack, Ortega-Hernandez did not consider <u>at all</u> the innocent men, women, and children who could have been gravely harmed by his criminal actions, including the members of the First Family, the White House staff and employees, the USSS, and tourists and innocent bystanders located on the Ellipse, at the south fence of the White House, and in Lafayette Square. <u>See</u> Exhibit N. Ortega-Hernandez's attack was not a spur-of-the-moment impulsive decision, but rather the culmination of a detailed plan on which the defendant had been working for more than seven months, during which he gathered the tools necessary to carry out the attack, practiced repeatedly to ensure success of the attack, lied to his family and friends about his whereabouts, and then traveled more than 2,000 miles by car from Idaho Falls, Idaho, to Washington, D.C., with his assault rifle and more than 180 rounds of ammunition, to carry out the attack. The serious nature of the defendant's offenses cannot be overstated.

<u>2. The History and Characteristics of the Offender</u>

Ortega-Hernandez is a 23-year-old male from Idaho Falls, Idaho. According to the pre-sentence report ("PSR"), the defendant dropped out of high school. He has been described by his friends and associates as a heavy user of marijuana and alcohol, but otherwise does not suffer from any substance abuse or dependency issues. According to the PSR, the defendant was supported by his parents, siblings, extended family, and friends.

With respect to his mental health, the PSR noted that "he has never suffered from, or been treated for, any mental or emotional health problems." PSR at 23. Shortly after his arrest,

---

travel to California. Moreover, even had the President been at the White House, Ortega-Hernandez's attack had a limited chance of success due to security measures taken by USSS. Other members of the First Family were present in the White House at the time of the defendant's attack, but were unharmed.

Dr. Elizabeth Teegarden of the District of Columbia's Department of Public Health evaluated the defendant and found "[t]here was also no overt evidence of, and he denied, phobias, bizarre thought content, or suicidal/homicidal ideation or intent.  His affect was full in range and appropriate to the matters discussed, and his eye contact was within normal limits."  Ltr. from Dr. Elizabeth Teegarden to the Honorable Alan Kay, at 4 (Nov. 22, 2011).

In preparation for sentencing, Dr. Robert K. Madsen was hired by the defendant to conduct a further psychological examination of him.  In his report, a copy of which was provided to the United States, Dr. Madsen notes that the defendant has suffered from, among other things, a lack of emotional stability stemming from his parents' divorce and other personal problems. Ltr. from Dr. Robert K. Madsen to R. Spelke Esq., et al., at 6, 8 (Feb. 28, 2014).   More importantly however, Dr. Madsen concludes that "[n]o current diagnosis of a mental disorder would be justified now...." Id. at 10.  Indeed, Dr. Madsen found his thinking to be "logical, goal-directed and without signs of any abnormalities, such as delusional thinking, loss of ego boundaries, hallucinations or other problems that reportedly occurred in the past."[7] Id. at 5. Instead, Dr. Madsen concludes that Ortega-Hernandez is "immature, ignorant and/or inept."  Id. at 12.

In short, both of the psychologists who examined Ortega-Hernandez found no mental impairment or disorder.  The defendant's claimed emotional instability, other personal problems,

---

[7] Dr. Madsen does attempt to minimize Ortega-Hernandez's criminal culpability by stating that the defendant lacked impulse control, and possibly could have put forth an insanity defense under a legislatively discarded 30-year-old standard.  See Ltr. from Dr. Robert K. Madsen to R. Spelke Esq., et al., at 11 (Feb. 28, 2014).  The United States submits that there is no evidence in the record that Ortega-Hernandez's careful planning, preparation, and execution of his detailed attack was a result of such lack of impulse control.  Moreover, the availability of outdated defenses is entirely irrelevant.  The only psychologist who examined Ortega-Hernandez close in time to the criminal act found no evidence of any mental disorder.  Furthermore, Dr. Madsen's own tests conclude that Ortega-Hernandez threat for re-offense is not "minimal," with "a 48% chance of a re-offense within 10 years." Id. at 5.

or immaturity are no justification or excuse for an attempt to assassinate the President of the United States by firing an assault rifle at the White House.  Instead, the detailed nature of his planning, preparation, and execution reveal the deliberate and clear-headed manner in which Ortega-Hernandez acted in this case.  Accordingly, nothing about the history and characteristics of Ortega-Hernandez presents uniquely mitigating circumstances to support a sentence outside the terrorism-adjusted guidelines range.

### 3.  The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

Imposing a substantial term of imprisonment in this case is absolutely necessary to promote the respect for the law, provide just punishment, afford adequate deterrence, and serve to protect the First Family and the general public from the defendant.  Standing alone, the defendant's actions of firing an assault rifle eight to ten times at 9:00 PM at the White House residence were reprehensible and warrant a severe sentence.  Moreover, a severe sentence in this case would serve as a strong deterrent to Ortega-Hernandez and any other domestic terrorists who would seek political change in this country by harming the lives of this, or any future, President and First Family.

### 4.  The Need to Avoid Unwarranted Sentence Disparities

In evaluating the terrorism-adjusted sentencing guidelines in this case, it is important to compare sentences imposed in other similar domestic terrorism cases.  The United States submits that the following cases are instructive in determining the appropriate sentence in this case:

- ***United States v. Duran*, 884 F. Supp. 577 (D.C.D.C 1995)***.  The Duran case is the most factually similar to the instant case.  In Duran, the defendant "had told other people of his desire to kill the President; that he wrote materials that threatened the life of the President and other government officials; that he bought a firearm; that he bought multiple round clips and multiple rounds of

ammunition for that firearm; that he bought a trench coat to conceal the firearm; that he bought a folding stock and pistol grip for the firearm so that it could be folded up and concealed under the trench coat; and that he traveled to Washington, D.C., and waited outside the White House for the opportunity to make an attempt on the life of the President of the United States." Id. at 579. The defendant began firing his weapon after he saw an individual who resembled President Clinton on the north grounds of the White House. The defendant fired approximately 20 rounds at the front of the White House, but no one was injured. Duran, 96 F.3d 1495, 1498 (D.C. Cir. 1996). While the Duran case was a trial rather than a plea, and occurred prior to the inclusions of a terrorism-adjustment in the sentencing guidelines, the defendant was sentenced to 40 years in prison.

- ***United States v. Melaku,*** **12-CR-27 (E.D. Va. 2012).**  Between October 17, 2010, and November 2, 2010, on five separate occasions, Yonathan Melaku fired multiple rounds from a 9mm semi-automatic pistol at various military-related sites in Northern Virginia.  Melaku fired the shots from his vehicle while driving past the sites in the early morning hours.  The sites included the Pentagon, the National Museum of the Marine Corps, a Marine Corps recruiting substation, and a U.S. Coast Guard recruiting office.  No one was injured during any of the five incidents.  Melaku pled guilty to one count of Injury to Property of the United States, in violation of Title 18, United States Code, Section 1361, and one count of Discharging a Firearm in violation of Title 18, United States Code, Section 924(c).  He was sentenced to 25 years imprisonment.

- ***United States v. El-Khalifi,*** **12-CR-37 (E.D. Va. 2012).**  Amine Mohamed El-Khalifi wanted to conduct a suicide bombing targeting the United States Capitol building.  The defendant enlisted two individuals to assist him in the plot, who unbeknownst to him, were undercover FBI agents.  The defendant conducted surveillance of the Capitol building on two separate occasions and detonated a test bomb at a quarry in West Virginia.  On February 17, 2012, the defendant was provided with what he believed was a functioning bomb and automatic weapon.  Neither were in fact operable.  The defendant was arrested as he departed for the Capitol.  The defendant pled guilty to attempting to use a weapon of mass destruction and was sentenced to 30 years imprisonment.

- ***United States v. Nafis,*** **12-CR-720 (E.D.N.Y. 2013).**  Mohammad Rezwanul Ahsan Nafis, a Bangladeshi national, attempted to form a terrorist cell in the United States.  Unbeknownst to him, one of the individuals Nafis attempted to recruit was a confidential source for the FBI.  After forming the cell, Nafis decided to conduct a bombing operation targeting the Federal Reserve Bank of New York in lower Manhattan.  To carry out the operation, Nafis met with an undercover FBI agent who supplied him with what he thought were

Page 24

explosives. Nafis recorded a video statement addressed to the American public. After Nafis repeatedly attempted to detonate the inert explosives, he was arrested. The defendant pled guilty to attempting to use a weapon of mass destruction and was sentenced to 30 years imprisonment.

- ***United States v. Martinez,* 10-CR-798 (D. Md. 2012)**. Antonio Martinez attempted to carry out a terrorist attack in the United States in retaliation for U.S. military's actions abroad. Unbeknownst to him, one of the individuals Martinez recruited into his plan was a confidential source for the FBI. To carry out the operation, Martinez met with an undercover FBI agent who supplied him with what he thought were explosives. Martinez attempted to detonate the explosives at an armed forces recruiting station, when he was arrested. The defendant pled guilty to attempting to use a weapon of mass destruction and was sentenced to 25 years imprisonment.

- ***United States v. Harpham,* 2011WL6838070 (E.D. Wa. 2011)**. Kevin Harpham placed an explosive device containing shrapnel coated with rat poison along the Martin Luther King, Jr. Day unity parade route in Spokane, Washington. The defendant pled guilty to attempted use of a weapon of mass destruction and a hate crime. At sentencing, the district court found that the terrorism adjustment should apply even though the criminal action was targeted at civilians rather than the government. The district court then sentenced the defendant to 32 years imprisonment.

In some cases, courts have handed down sentences that varied from terrorism-adjusted sentencing guidelines ranges in situations involving non-violent supporters rather than principal actors. For example, in United States v. Benkahla, 501 F. Supp. 2d 748, 751 (E.D. Va. 2007), the defendant was convicted at trial of making false statements to the grand jury and obstructing justice in a federal criminal investigation of overseas terrorist groups. Following the conviction, the district court concluded that the terrorism adjustment did apply to the facts of this case. Id. at 757. The court varied from the terrorism-adjusted guidelines however, because the court found the defendant did not have "the willful intent to promote an act of terrorism," and was "not the lynchpin in any organization or conspiracy being investigated." Id. at 760. The court further concluded that a terrorism-adjusted guidelines sentence was too severe for an individual

convicted of lying to a grand jury. Id. See also United States v. Thavaraja, 740 F.3d 253, 260-61 (2d Cir. 2014) (upholding variance from terrorism-adjusted sentencing guidelines involving Sri Lankan terrorist group because "this was an unusual case because it carries the banner of terrorism and yet involves people who certainly pose no direct threat to the United States").

Courts have been less willing to vary from a terrorism-adjusted guidelines sentence when the defendant is the principal actor in the terrorist act. Indeed, appellate courts have found variances from terrorism-adjusted sentencing guidelines for such principal actors to be substantively unreasonable. For example, in United States v. Ressam, 679 F.3d 1069, 1073 (9th Cir. 2012), the defendant was arrested crossing the border from Canada into Washington state with explosives. It was later determined that his target was Los Angeles International Airport on the eve of the new millennium. The district court sentenced the defendant to 22 years imprisonment, well below the terrorism-adjusted sentencing guidelines range. Id. at 1089. In vacating the sentence, the Ninth Circuit explained, the defendant's "clear intent was to intimidate this nation and the world, and he sought to influence world events and the conduct of the United States government through that intimidation. The Sentencing Guidelines specifically provide for a substantial upward adjustment for federal crimes of terrorism. The sentence imposed by the district court effectively negated that adjustment." Id. at 1090; see also United States v. Jayyousi, 657 F.3d 1085, 1117 (11th Cir. 2011) ("Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."); United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the

crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.").

Applying these principles to Ortega-Hernandez's case, the United States respectfully submits that in this case, like the many cases outlined above, the defendant's "clear intent was to intimidate this nation and the world, and he sought to influence world events and the conduct of the United States government through that intimidation. The Sentencing Guidelines specifically provide for a substantial upward adjustment for federal crimes of terrorism." Ressam, 679 F.3d at 1090. This Court should apply those guidelines and sentence the defendant to a combined term of **imprisonment of 27.5 years** in this case, the high end of that range.

## CONCLUSION

WHEREFORE, for the reasons stated above, the United States respectfully requests that

the Court sentence the defendant to a combined term of **imprisonment of 27.5 years** in this case.


Respectfully Submitted,


RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
DC Bar No. 447889

By: _____
    GEORGE P. VARGHESE
    Special Assistant United States Attorney
    ALESSIO D. EVANGELISTA
    Assistant United States Attorney
    555 Fourth Street, N.W.
    Washington, DC 20530
    (617) 748-3237 (Varghese)
    (202) 252-7247 (Evangelista)